# Exhibit A

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

ALIBABA GROUP HOLDING LIMITED, JACK YUN MA,
(Additional Parties Attachment form is attached)

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

GARY BUELOW, Individually and on Behalf of All Others Similarly
Situated

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**ENDORSED FILED**
SAN MATEO COUNTY

OCT - 5 2015

Clerk of the Superior Court
By  MADELINE MASTERSON
DEPUTY CLERK

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*  Superior Court of San Mateo County<br><br>400 County Center, 4th Floor<br>Redwood City, CA 94063 | CASE NUMBER:<br>*(Número del Caso):*  CIV 5 3 5 6 9 2 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Shawn A. Williams, Robbins Geller, One Montgomery St., Ste. 1800, San Francisco, CA 94104 415/288-4545

| | | | |
|---|---|---|---|
| DATE: **OCT - 5 2015**<br>*(Fecha)* | MADELINE MASTERSON<br>Clerk, by<br>*(Secretario)* | , Deputy<br>*(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*
3. [X] on behalf of *(specify):* Alibaba Group Holding Limited

   under: [X] CCP 416.10 (corporation)      [ ] CCP 416.60 (minor)
   [ ] CCP 416.20 (defunct corporation)      [ ] CCP 416.70 (conservatee)
   [ ] CCP 416.40 (association or partnership)  [ ] CCP 416.90 (authorized person)

   [X] other *(specify):* a form of business entity unknown
4. [X] by personal delivery on *(date):* 10-16-15

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Page 1 of 1<br>Code of Civil Procedure §§ 412.20, 465<br>www.courtinfo.ca.gov |

SUM-200(A)

| | |
|---|---|
| SHORT TITLE:<br>Buelow v. Alibaba Group Holding Limited, et al. | CASE NUMBER: |

### INSTRUCTIONS FOR USE

➔ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

➔ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff   ☑ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

JOSEPH C. TSAI, MASAYOSHI SON, JONATHAN ZHAOXI LU, MAGGIE WEI WU, TIMOTHY A. STEINERT, CREDIT SUISSE SECURITIES (USA) LLC, DEUTSCHE BANK SECURITIES INC. LLC, GOLDMAN SACHS (ASIA) LLC, J.P. MORGAN SECURITIES LLC, MORGAN STANLEY & CO. INTERNATIONAL, CITIGROUP GLOBAL MARKETS INC., BOCI ASIA LIMITED LLC, CHINA INTERNATIONAL CAPITAL CORPORATION HONG KONG SECURITIES LIMITED, CLSA LIMITED, DBS BANK LTD., HSBC SECURITIES (USA) INC., MIZUHO SECURITIES USA INC., PACIFIC CREST SECURITIES LLC, STIFEL, NICOLAUS & COMPANY, INCORPORATED, WELLS FARGO SECURITIES, LLC, BNP PARIBAS SECURITIES CORP., EVERCORE GROUP LLC, RAYMOND JAMES & ASSOCIATES, INC., SUNTRUST ROBINSON HUMPHREY, INC., BHF-BANK AKTIENGESELLSCHAFT LLC, CIMB SECURITIES LIMITED, CHINA MERCHANTS SECURITIES (HK) CO., LIMITED, ING FINANCIAL MARKETS LLC, NEEDHAM & COMPANY LLC, NOMURA SECURITIES INTERNATIONAL, INC., RAINE SECURITIES LLC, RBS SECURITIES INC. LLC, SG AMERICAS SECURITIES LLC, C.L. KING & ASSOCIATES, INC., LEBENTHAL & CO., MISCHLER FINANCIAL GROUP, INC., SAMUEL A. RAMIREZ & COMPANY, INC., TOPEKA CAPITAL MARKETS INC., THE WILLIAMS CAPITAL GROUP, L.P. and DOES 1-25, inclusive,

Page __1__ of __1__

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
Shawn A. Williams (213113)
Robbins Geller Rudman & Dowd LLP
One Montgomery Street, Suite 1800
San Francisco, CA 94104
TELEPHONE NO.: 415/228-4545    FAX NO.: 415/228-4534
ATTORNEY FOR *(Name):* Plaintiff Gary Buelow

**ENDORSED FILED**
SAN MATEO COUNTY

OCT - 5 2015

Clerk of the Superior Court
By ___MADELINE MASTERSON___
DEPUTY CLERK

FILE BY FAX

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  San Mateo
STREET ADDRESS: 400 County Center, 4th Floor
MAILING ADDRESS:
CITY AND ZIP CODE: Redwood City, CA 94063
BRANCH NAME: Hall of Justice and Records

CASE NAME:
Buelow v. Alibaba Group Holding Limited, et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [✓] Unlimited (Amount demanded exceeds $25,000)   [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402)   DEPT: | CIV 535692 |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[✓] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [✓] is [ ] is not    complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [✓] Large number of separately represented parties
   b. [✓] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [✓] Substantial amount of documentary evidence
   d. [✓] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [✓] monetary  b. [✓] nonmonetary; declaratory or injunctive relief  c. [ ] punitive
4. Number of causes of action *(specify):*  Three
5. This case [✓] is [ ] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: October 5, 2015

Shawn A. Williams
*(TYPE OR PRINT NAME)*                    *(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)*

**NOTICE**
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
• Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | CIVIL CASE COVER SHEET | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courtinfo.ca.gov |

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
  Auto (22)—Personal Injury/Property
    Damage/Wrongful Death
  Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
  Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/
      Wrongful Death
  Product Liability *(not asbestos or toxic/environmental)* (24)
  Medical Malpractice (45)
    Medical Malpractice—
      Physicians & Surgeons
    Other Professional Health Care
      Malpractice
  Other PI/PD/WD (23)
    Premises Liability (e.g., slip
      and fall)
    Intentional Bodily Injury/PD/WD
      (e.g., assault, vandalism)
    Intentional Infliction of
      Emotional Distress
    Negligent Infliction of
      Emotional Distress
    Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
  Business Tort/Unfair Business
    Practice (07)
  Civil Rights (e.g., discrimination,
    false arrest) *(not civil harassment)* (08)
  Defamation (e.g., slander, libel)
    (13)
  Fraud (16)
  Intellectual Property (19)
  Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice
      *(not medical or legal)*
  Other Non-PI/PD/WD Tort (35)

**Employment**
  Wrongful Termination (36)
  Other Employment (15)

**Contract**
  Breach of Contract/Warranty (06)
    Breach of Rental/Lease
      Contract *(not unlawful detainer or wrongful eviction)*
    Contract/Warranty Breach–Seller
      Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/
      Warranty
    Other Breach of Contract/Warranty
  Collections (e.g., money owed, open
    book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections
      Case
  Insurance Coverage *(not provisionally complex)* (18)
    Auto Subrogation
    Other Coverage
  Other Contract (37)
    Contractual Fraud
    Other Contract Dispute

**Real Property**
  Eminent Domain/Inverse
    Condemnation (14)
  Wrongful Eviction (33)
  Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
  Commercial (31)
  Residential (32)
  Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
  Asset Forfeiture (05)
  Petition Re: Arbitration Award (11)
  Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court
      Case Matter
    Writ–Other Limited Court Case
      Review
  Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor
      Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
  Antitrust/Trade Regulation (03)
  Construction Defect (10)
  Claims Involving Mass Tort (40)
  Securities Litigation (28)
  Environmental/Toxic Tort (30)
  Insurance Coverage Claims
    *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
  Enforcement of Judgment (20)
    Abstract of Judgment (Out of
      County)
    Confession of Judgment *(non-domestic relations)*
    Sister State Judgment
    Administrative Agency Award
      *(not unpaid taxes)*
    Petition/Certification of Entry of
      Judgment on Unpaid Taxes
    Other Enforcement of Judgment
      Case

**Miscellaneous Civil Complaint**
  RICO (27)
  Other Complaint *(not specified above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-harassment)*
    Mechanics Lien
    Other Commercial Complaint
      Case *(non-tort/non-complex)*
    Other Civil Complaint
      *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
  Partnership and Corporate
    Governance (21)
  Other Petition *(not specified above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult
      Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late
      Claim
    Other Civil Petition

| Attorney or Party without Attorney (Name/Address)<br>Shawn A. Williams, Robbins Geller Rudman & Dowd LLP<br>One Montgomery Street, Suite 1800<br>San Francisco, CA 94104<br><br>Telephone: 415/288-4545<br>State Bar No.: 274921<br>Attorney for: Plaintiff Gary Buelow | FOR COURT USE ONLY<br><br>**ENDORSED FILED**<br>SAN MATEO COUNTY<br><br>OCT - 5 2015<br><br>Clerk of the<br>By MADELINE MASTERSON<br>DEPUTY CLERK |
|---|---|
| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF SAN MATEO<br>400 COUNTY CENTER<br>REDWOOD CITY, CA 94063 | |
| Plaintiff<br>  Gary Buelow | |
| Defendant<br>  Alibaba Group Holding Limited, et al. | |
| **Certificate Re Complex Case Designation** | Case Number<br>**CIV 535 92** |

# This certificate must be completed and filed with your Civil Case Cover Sheet if you have checked a Complex Case designation or Counter-Designation

1.  In the attached Civil Case Cover Sheet, this case is being designated or counter-designated as a complex case [or as not a complex case] because at least one or more of the following boxes has been checked:

    ☒  Box 1 – Case type that is best described as being [or not being] provisionally complex civil litigation (i.e., antitrust or trade regulation claims, construction defect claims involving many parties or structures, securities claims or investment losses involving many parties, environmental or toxic tort claims involving many parties, claims involving mass torts, or insurance coverage claims arising out of any of the foregoing claims).

    ☒  Box 2 – Complex [XXXXXXXXXXX] due to factors requiring exceptional judicial management

    ☒  Box 5 – Is [XXXXXX] a class action suit.

2.  This case is being so designated based upon the following supporting information [including, without limitation, a brief description of the following factors as they pertain to this particular case: (1) management of a large number of separately represented parties; (2) complexity of anticipated factual and/or legal issues; (3) numerous pretrial motions that will be time-consuming to resolve; (4) management of a large number of witnesses or a substantial amount of documentary evidence; (5) coordination with related actions

pending in one or more courts in other counties, states or countries or in a federal court;
(6) whether or not certification of a putative class action will in fact be pursued; and (7)
substantial post-judgment judicial supervision]:

This case is provisionally complex as it involves securities claims.  In addition, it is being

designated complex due to the large number of parties, the complexity of factual and/or legal

issues and because certification of a putative class will be pursued.

*(attach additional pages if necessary)*

3.      Based on the above-stated supporting information, there is a reasonable basis for the complex
        case designation or counter-designation [or noncomplex case counter-designation] being made
        in the attached Civil Case Cover Sheet.

*****

I, the undersigned counsel or self-represented party, hereby certify that the above is true and correct
and that I make this certification subject to the applicable provisions of California Code of Civil
Procedure, Section 128.7 and/or California Rules of Professional Conduct, Rule 5-200 (B) and San
Mateo County Superior Court Local Rules, Local Rule 2.30.

Dated:   October 5, 2015

_Shawn A. Williams_
[Type or Print Name]

[Signature of Party or Attorney For Party]

1  ROBBINS GELLER RUDMAN
       & DOWD LLP
2  SHAWN A. WILLIAMS (213113)
   DAVID W. HALL (274921)
3  Post Montgomery Center
   One Montgomery Street, Suite 1800
4  San Francisco, CA  94104
   Telephone:  415/288-4545
5  415/288-4534 (fax)

6  Attorneys for Plaintiff

7

**ENDORSED FILED**
SAN MATEO COUNTY

OCT - 5 2015

Clerk of the Superior Court
By  MADELINE MASTERSON
       DEPUTY CLERK

FILE BY FAX

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                          COUNTY OF SAN MATEO

10 GARY BUELOW, Individually and on Behalf ) **VIA FAX**
   of All Others Similarly Situated,        )
11                                           )  Case No.
                                 Plaintiff,  )
12                                           )  **CLASS ACTION**
             vs.                             )
13                                           )  COMPLAINT FOR VIOLATIONS OF THE
   ALIBABA GROUP HOLDING LIMITED,            )  SECURITIES ACT OF 1933
14 JACK YUN MA,                              )
   JOSEPH C. TSAI,                           )
15 MASAYOSHI SON,                            )
   JONATHAN ZHAOXI LU,                       )
16 MAGGIE WEI WU,                            )
   TIMOTHY A. STEINERT,                      )
17 CREDIT SUISSE SECURITIES (USA) LLC,       )
   DEUTSCHE BANK SECURITIES INC. LLC,        )
18 GOLDMAN SACHS (ASIA) LLC,                 )
   J.P. MORGAN SECURITIES LLC,               )
19 MORGAN STANLEY & CO.                      )
       INTERNATIONAL,                        )
20 CITIGROUP GLOBAL MARKETS INC.,            )
   BOCI ASIA LIMITED LLC,                    )
21 CHINA INTERNATIONAL CAPITAL               )
       CORPORATION HONG KONG                 )
22     SECURITIES LIMITED,                   )
   CLSA LIMITED,                             )
23 DBS BANK LTD.,                            )
   HSBC SECURITIES (USA) INC.,               )
24 MIZUHO SECURITIES USA INC.,               )
   PACIFIC CREST SECURITIES LLC,             )
25 STIFEL, NICOLAUS & COMPANY,               )
       INCORPORATED,                         )  **DEMAND FOR JURY TRIAL**
26 _____  )

27 [Caption continued on following page.]

28

WELLS FARGO SECURITIES, LLC,                )
BNP PARIBAS SECURITIES CORP.,               )
EVERCORE GROUP LLC,                          )
RAYMOND JAMES & ASSOCIATES, INC.,            )
SUNTRUST ROBINSON HUMPHREY, INC.,            )
BHF-BANK AKTIENGESELLSCHAFT LLC,             )
CIMB SECURITIES LIMITED,                     )
CHINA MERCHANTS SECURITIES (HK)             )
    CO., LIMITED,                            )
ING FINANCIAL MARKETS LLC,                   )
NEEDHAM & COMPANY LLC,                       )
NOMURA SECURITIES INTERNATIONAL,            )
    INC.,                                    )
RAINE SECURITIES LLC,                        )
RBS SECURITIES INC. LLC,                     )
SG AMERICAS SECURITIES LLC,                  )
C.L. KING & ASSOCIATES, INC.,                )
LEBENTHAL & CO.,                             )
MISCHLER FINANCIAL GROUP, INC.,              )
SAMUEL A. RAMIREZ & COMPANY, INC.,           )
TOPEKA CAPITAL MARKETS INC.,                 )
THE WILLIAMS CAPITAL GROUP, L.P.             )
and DOES 1-25, inclusive,                    )
                                             )
                    Defendants.              )
_____     )

### INTRODUCTION

1.      Plaintiff, individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Alibaba Group Holding Limited ("Alibaba" or the "Company"), as well as media and analyst reports about the Company and Company press releases.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein.

### SUMMARY OF THE ACTION

2.      Plaintiff brings this securities class action on behalf of all persons who purchased or otherwise acquired Alibaba American Depository Shares ("ADS") pursuant or traceable to the registration statement and prospectus (collectively, the "Registration Statement") issued in connection with Alibaba's September 2014 initial public stock offering (the "IPO" or "Offering").

3.      The action asserts strict liability claims under §§11, 12 and 15 of the Securities Act of 1933 ("1933 Act" or "Securities Act") against Alibaba, certain Alibaba officers and directors, and the underwriters of the IPO.

4.      Alibaba is a China-based online and mobile commerce company in retail and wholesale trade, as well as cloud computing and other services.  Alibaba represents that it is "the largest online and mobile commerce company in the world in terms of gross merchandise volume" in 2013.  The Company hosts an online sales platform for third parties and does not engage in any direct sales, compete with merchants, or hold inventory.

5.      In September 2014, Alibaba commenced the IPO and issued approximately 368 million shares of ADS at $68 per share, all pursuant to the Registration Statement.

6.      The Registration Statement contained untrue statements of material fact and omitted to state material facts both required by governing regulations and necessary to make the statements made not misleading.  The Registration Statement failed to disclose that Alibaba executives had met with

China's State Administration of Industry and Commerce ("SAIC") in July 2014, just two months before the IPO in the United States, and that regulators had then notified Alibaba of a variety of illegal business practices that threatened the core of Alibaba's business, including:

- the rampant sale of counterfeit goods, including fake cigarettes, alcohol and branded handbags, by vendors on Alibaba's third-party marketplace platform;

- the sale of restricted weapons and other prohibited items on Alibaba's third-party marketplace platform;

- that Alibaba staffers had taken bribes from merchants and others seeking help to increase their search rankings and to get advertising space;

- that Alibaba ignored the practice by some vendors of faking transactions to make their sales volumes appear higher; and

- accused Alibaba of alleged anticompetitive behavior such as forbidding merchants to participate in rival sites' promotions.

7.      Defendants were required to disclose this material information in the Registration Statement for three independent reasons. First, SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), required disclosure of any known events or uncertainties that at the time of the IPO had caused or were reasonably likely to cause Alibaba's disclosed financial information not to be indicative of future operating results. Alibaba's then occurring but undisclosed illegal practices and the severe regulatory scrutiny drawn thereby were likely to (and in fact did) materially and adversely affect Alibaba's future results and prospects.

8.      Second, SEC Regulation S-K, 17 C.F.R. §229.503 ("Item 503"), required, in the "Risk Factor" section of the IPO Registration Statement, a discussion of the most significant factors that make the offering risky or speculative and that each risk factor adequately describe the risk. Alibaba's discussions of risk factors did not adequately describe the risk posed by Alibaba's already occurring violations and illegal practices and the intense regulatory scrutiny drawn thereby, nor the likely and consequent material adverse effects on the Company's future results and prospects.

9.      Third, defendants' failure to disclose that Alibaba was already the subject of administrative law enforcement proceedings that created imminent and material risks to its business operations, and which likely would have a material effect on its revenue, income and share price, as well as the expected adverse consequences therefrom, rendered false and misleading the Registration

- 2 -

1  Statement's many references to known risks that "*if*" occurring "*might*" or "*could*" adversely affect the

2  Company. These "risks" had already materialized at the time of the IPO.

3      10.    On or about September 19, 2014 Alibaba shares began trading publicly and its IPO was

4  extremely lucrative for defendants, who raised more than $25 billion in gross proceeds. In the weeks

5  and months following, the price of Alibaba ADS shares shot up to trade at $120 per share.

6      11.    Analyst coverage over the following weeks and months was ecstatic. For example, on

7  September 22, 2014, analysts with MKM Partners issued a report entitled "Alibaba Group Holding Ltd.

8  . . . Powerhouse in Best Secular Growth Market for eCommerce," which initiated coverage at a target

9  price nearly 50% above the offering price as follows:

10          Following the *record-setting IPO* on Friday, we are initiating coverage of
11      BABA with a Buy rating and a 12-month target price of $125. . . . China's eCommerce
        economy is *booming*. . . . BABA's market position is *dominant*. . . . This is a *highly*
12      *profitable* business model.

13      12.    On October 8, 2014, analysts with Macquarie Research issued a report entitled "Alibaba

14  Group Holdings – Doors wide open," which stated:

15          Following *years of anticipation* with *much fanfare* in recent memory, Alibaba
        was finally listed on NYSE at a valuation of US$168bn (closed at US$232bn on Day 1
16      of trading). *There has never been a bigger company in the private sector around the*
        *world on the day of their IPO.*

17      13.    On October 29, 2014, analysts with Credit Suisse initiated coverage of Alibaba, issuing a

18  report entitled "Alibaba Group – The giant marches on," which stated:

19          Still ample upside potential despite the *44% post-IPO rally*. We initiate
20      coverage on Alibaba Group with an OUTPERFORM rating and a target price of
        US$114. We forecast a ~37% revenue CAGR over the next three years . . . . This
21      revenue growth, combined with the *incomparable scalability* (*it is the largest e-*
        *commerce ecosystem in the world*) and operating leverage should help the company
22      deliver sustainable earnings in the coming years.

23      14.    When the truth of defendants' misrepresentations and omissions became known, the

24  price of Alibaba shares suffered sharp declines. For example, on January 28, 2015, before the opening

25  of trading, various members of the financial media reported that SAIC, China's main corporate

26  regulator, had released a white paper accusing Alibaba of engaging in the very illegal conduct reported

27  directly to Alibaba executives in July 2014.

28

15.    On January 28, 2015, *The Wall Street Journal*, whose reporters had reviewed the SAIC white paper, reported as follows:

> The Chinese government accused e-commerce giant Alibaba of failing to crack down on the sale of fake goods, bribery and other illegal activity on its sites in a rare public dispute with one of the country's most prominent companies.

> *   *   *

> ***The accusations from the Chinese government could lend further force to those complaints and damage Alibaba's reputation among investors and brands overseas, while the highly public spat could hurt the company's relationship with the government, experts warn.***

> The government's accusations are in a white paper made public on Wednesday by China's State Administration for Industry and Commerce, ***but based on conversations between the agency and Alibaba officials in July.*** That was two months before Alibaba's U.S. IPO, which valued the Chinese company at more than $230 billion. ***In the paper, the agency said it held off on disclosing details of the talk so as not to affect the IPO.***

> *   *   *

> ***The report said the problems had grown to become Alibaba's "greatest credibility crisis" since the company was established. Citing a Chinese phrase that refers to letting a small problem fester, the paper said, "for a long time, [Alibaba] didn't pay sufficient attention to the issue and didn't adopt effective measures, causing a neglected carbuncle to become the bane of its life."***

16.    On this news, the price of Alibaba ADS's dropped 4%, or $4.49 per ADS, closing at $98.45 per ADS on January 28, 2015, on unusually high volume of approximately 42 million shares trading.

17.    On January 29, 2015, before the market opened, Alibaba issued a press release announcing mixed financial results for the fourth quarter 2014 ("4Q 2014"), and addressing the SAIC white paper.

18.    Market analysts reacted negatively.  For example, on January 28, 2015, analysts with Deutsche Bank issued a report stating:

> **SAIC claims abuses of Alibaba platform**

> China's State Administration for Industry & Commerce (SAIC) recently issued a report claiming malpractice on several fronts, including: 1) insufficient control of merchants on Taobao, some of which do not hold proper licenses, 2) a lack of controls around ***counterfeit products, illegal products***, and ***products that infringe upon trademarks***, 3) insufficient attention to ***misleading sales promotions*** (specifically the

- 4 -

Double 11 & 12 events) and *even instances of bribery*, 4) flaws in the platform's merchant credit rating and comment mechanism, leading to *fake transactions* and the deletion of negative comments, 5) Taobao *staff assisting illegal and unauthorized stores to avoid govt inspection*, 6) the lack of a proper merchant black-listing mechanism, and 7) a lack of transparency into merchant data, leading to difficulties in investigating illegal activities.

**Delay in report publishing**

The report was prepared based on a meeting between govt business regulators and Alibaba in July 2014. *The SAIC claims it had delayed the release of the report to avoid affecting Ali's IPO*. This news may cause near term weakness in the stock and is a situation we will monitor closely. *We find the timing* of these actions somewhat *interesting*.

19.     On January 29, 2015, analysts with BMO Capital Markets issued a report stating:

The company delivered a mixed performance with overall revenues and take rate lighter than expected. Mobile GMV, mobile revenues, Taobao GMV, and active buyers were all better than expected,, [sic] operating expenses were lower than expected, and adjusted EBITDA was higher than expected.  We believe the selloff of the shares following the earnings release was driven primarily driven [sic] by the lower-than-expected revenues and by a white paper posted by the State Administration for Industry and Commerce alleging that Alibaba has not done enough to combat the sale of counterfeit products by some of its sellers.

20.     On these developments, the price of Alibaba ADSs dropped another $8.64 per share to close at $89.81 per share on January 29, 2015, a one-day decline of approximately 9%, again on extremely high volume of more than 76.3 million shares trading.

21.     On January 30, 2015, analysts with Rosenblatt Securities Inc. issued a report stating:

We believe the battle between Alibaba and SAIC might escalate, which will put near-term pressure on the company.

*         *         *

*SAIC basically said in their white paper* that based on a sample of products collected on the Taobao platform (as well as other eCommerce platforms) conducted between August and October 2014, *approximately 63% were not authentic*.

22.     On February 2, 2015, analysts with Trefis issued a report stating as follows:

[An] area that disconcerted market participants is the negative news pertaining to recent criticism of Alibaba from the Chinese regulator 'State Administration for Industry and Commerce' (SAIC). Authorities are critical of the company for not doing enough to limit sale of counterfeit products on its marketplaces.  While the report has now been taken down from the regulator's website, *we believe this development will impact growth* on Alibaba's Taobao marketplace in the near-term, as we expect the company to now move quickly in removing counterfeit products on its sites, and this could lead to closure of a large number of seller accounts.  In addition, *since Alibaba*

*provided little information about its July 2014 meeting with SAIC in its IPO documents, it could also cause legal issues for the company.*

23.   On these and other reports of counterfeiting and fake orders, the price of Alibaba ADS shares dropped nearly 6% on high volume to trade at prices as low as $80.03 on March 3, 2015.

24.   These concerns continued to reverberate throughout the market. For example, on March 10, 2015, an article by TheStreet.com entitled "Alibaba Can't Seem to Shake Its Counterfeit Products Problem" documented and echoed market concerns as follows:

> Alibaba has been tumbling . . . and it doesn't appear that a turnaround is in the immediate future.
>
> The downward spiral can be attributed to a number of different causes, but one major problem is the Hangzhou, China-based e-commerce company's struggles with counterfeit and regulatory issues. . . .
>
> Alibaba's misfortunes were amplified in January when the Chinese government accused the company of allowing fake goods to be sold on its site and failing to sufficiently regulate illegal activity. China's State Administration for Industry and Commerce then published a white paper detailing the accusation, but soon retracted it after Alibaba claimed it was false. Alibaba chairman Jack Ma met with the head of China's commerce regulator to smooth things over.
>
> ***But that wasn't the end of it.*** Earlier this month *The Wall Street Journal* reported on a common illegal practice in China called "brushing," in which sellers use fake customers to inflate sales numbers, improperly improving their online status. According to the Journal, Alibaba uses "sophisticated tools" to counter-brush, but the practice is hard to detect, ***calling into question the large volume of transactions reportedly taking place on the e-commerce site.***
>
> Alibaba's Vice President Yu Weimin even admitted to the high percentage of brushing on the site. In November, he told China's state-run Xinhua News Agency that in 2013, 1.2 million sellers or ***about 17% of all merchants on Taobao, Alibaba's main shopping site, had faked 500 million transactions*** (worth 10 billion Yuan, or about $1.6 billion USD). This, he explained, was a "conservative estimate."
>
> Following the controversy over fake goods, Alibaba yesterday decided to dismiss Wang Yulei, the head of Tmall.com (the business-to-consumer version of Taobao), from his role and reassign him elsewhere.

25.   On May 15, 2015, Kering S.A., parent company of Gucci, Yves St. Laurent and other luxury brands, filed a federal lawsuit in the Southern District of New York naming Alibaba as a defendant and alleging in great detail as follows:

> The Alibaba Defendants *facilitate and encourage the sale of an enormous number of Counterfeit Products through their self-described "ecosystem,"* which provides manufacturers, sellers, and buyers of counterfeit goods with a marketplace for such goods, and provides online marketing, credit card processing, financing, and shipping services that effectuate the sale of the Counterfeit Products.

- 6 -

26.     On these developments, the price for Alibaba ADS shares dropped nearly 3% from a high of $88.96 on May 15, 2015 to as low as $86.61 on the very next trading day, May 18, 2015.

27.     On August 31, 2015, analysts with Deutsche Bank issued a report entitled "Insights into platform clean-up," which echoed the same concerns as follows:

> We have spent the past several days undertaking "grassroots-level" discussions with a host of merchants and customers on the Alibaba domestic retail platforms. **Our main take-aways relate to . . . the heightened cleansing of the platform, which we trace to the beginning of 2015. We however reduce GMV as a result** of progress in this area . . . .

> **Cleaning up user, merchant experience; some sacrifice of GMV in order**

> We cut GMV assumptions in the wake of extensive channel checks with platform customers and merchants, which indicate measurable progress against brushing, counterfeiting and other untoward practices. These measures . . . limit . . . our GMV outlook.

28.     On these developments, the price of Alibaba declined dramatically from a high of $71.59 per share on August 27, 2015 to as low as $ 64.05 per share on September 1, 2015, an over 10% decline on high volume.

29.     By September 24, 2015, Alibaba shares traded below $60 per share, a decline of over 50% from the $120 per share high.  All told, investor suffered billions of dollars in losses.

## JURISDICTION AND VENUE

30.     This Court has original subject matter jurisdiction under the California Constitution, Article VI, §10.  Removal is barred by §22 of the 1933 Act.

31.     This Court has personal jurisdiction under California Code of Civil Procedure §410.10 because defendants and their agents affirmatively solicited the subject securities and Registration Statement to investors in California, including, *e.g.*, during roadshows conducted in California, and those contacts with California have a substantial connection to the claims alleged herein.

32.     This Court is a proper venue under California Code of Civil Procedure §395.

## PARTIES

33.     Plaintiff Gary Buelow purchased Alibaba ADS shares pursuant or traceable to the IPO and was damaged thereby.

- 7 -

34.     Defendant Alibaba is headquartered in China and incorporated in the Cayman Islands. Its ADS shares are traded on the NYSE under the ticker symbol "BABA." Alibaba's U.S. offices are located at 400 South El Camino Real, Suite 400, San Mateo, California.

35.     Defendant Jack Yun Ma ("Ma") is the founder of Alibaba and Executive Chairman of Alibaba's Board of Directors. Ma owned 8.8% of Alibaba's outstanding shares prior to the IPO. Ma sold approximately 12,750,000 Alibaba ADS shares in the IPO and received gross proceeds of approximately $867,000,000. Ma signed the Registration Statement.

36.     Defendant Joseph C. Tsai ("Tsai") is Alibaba's Executive Vice Chairman. Tsai owned 3.6% of Alibaba's outstanding shares prior to the IPO. Tsai sold approximately 4,250,000 Alibaba ADS shares in the IPO and received gross proceeds of approximately $289,000,000. Tsai signed the Registration Statement.

37.     Defendant Masayoshi Son ("Son"), at the time of the IPO, was a Director of Alibaba. Son signed the Registration Statement.

38.     Defendant Jonathan Zhaoxi Lu ("Lu"), at the time of the IPO, was Alibaba's Chief Executive Officer. Lu signed the Registration Statement.

39.     Defendant Maggie Wei Wu ("Wu"), at the time of the IPO, was Alibaba's Chief Financial Officer. Wu signed the Registration Statement.

40.     Defendant Timothy A. Steinert ("Steinert"), at the time of the IPO, was Alibaba's General Counsel and Corporate Secretary. Steinert signed the Registration Statement.

41.     The defendants named in ¶¶35-40 are referred to herein as the "Individual Defendants." The Individual Defendants each signed the Registration Statement, solicited the investing public to purchase securities issued pursuant thereto, hired and assisted the underwriters, planned and contributed to the IPO and Registration Statement, and attended road shows and other promotions to meet with and present favorable information to potential Alibaba investors, all motivated by their own and the Company's financial interests.

42.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is a financial services company that acted as an underwriter for Alibaba's IPO, helping to draft and disseminate the

1  Registration Statement and solicit investors to purchase Alibaba securities issued pursuant thereto.

2  Credit Suisse has offices in San Francisco and Menlo Park, California.

3       43.    Defendant Deutsche Bank Securities Inc. LLC ("Deutsche Bank") is a financial services

4  company that acted as an underwriter for Alibaba's IPO, helping to draft and disseminate the

5  Registration Statement and solicit investors to purchase Alibaba securities issued pursuant thereto.

6  Deutsche Bank has offices in San Francisco and Menlo Park, California.

7       44.    Defendant Goldman Sachs (Asia) LLC ("Goldman Sachs") is a financial services

8  company that acted as an underwriter for Alibaba's IPO, helping to draft and disseminate the

9  Registration Statement and solicit investors to purchase Alibaba securities issued pursuant thereto.

10  Goldman Sachs has offices in San Francisco and Menlo Park, California.

11      45.    Defendant J.P. Morgan Securities LLC ("J.P. Morgan") is a financial services company

12  that acted as an underwriter for Alibaba's IPO, helping to draft and disseminate the Registration

13  Statement and solicit investors to purchase Alibaba securities issued pursuant thereto. J.P. Morgan has

14  offices in San Francisco and Palo Alto, California.

15      46.    Defendant Morgan Stanley & Co. International ("Morgan Stanley") is a financial

16  services company that acted as an underwriter for Alibaba's IPO, helping to draft and disseminate the

17  Registration Statement and solicit investors to purchase Alibaba securities issued pursuant thereto.

18  Morgan Stanley has offices in San Francisco and Menlo Park, California.

19      47.    Defendant Citigroup Global Markets Inc. ("Citigroup") is a financial services company

20  that acted as an underwriter for Alibaba's IPO, helping to draft and disseminate the Registration

21  Statement and solicit investors to purchase Alibaba securities issued pursuant thereto.  Citigroup has

22  offices in San Francisco, California.

23      48.    Defendant BOCI Asia Limited LLC is a financial services company that acted as an

24  underwriter for Alibaba's IPO, helping to draft and disseminate the Registration Statement and solicit

25  investors to purchase Alibaba securities issued pursuant thereto.

26      49.    Defendant China International Capital Corporation Hong Kong Securities Limited

27  ("CICC") is a financial services company that acted as an underwriter for Alibaba's IPO, helping to

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1  draft and disseminate the Registration Statement and solicit investors to purchase Alibaba securities

2  issued pursuant thereto.

3      50.    Defendant CLSA Limited ("CLSA") is a financial services company that acted as an

4  underwriter for Alibaba's IPO, helping to draft and disseminate the Registration Statement and solicit

5  investors to purchase Alibaba securities issued pursuant thereto.  CLSA has offices or representatives in

6  San Francisco, California.

7      51.    Defendant DBS Bank Ltd. is a financial services company that acted as an underwriter

8  for Alibaba's IPO, helping to draft and disseminate the Registration Statement and solicit investors to

9  purchase Alibaba securities issued pursuant thereto.

10     52.    Defendant HSBC Securities (USA) Inc. is a financial services company that acted as an

11  underwriter for Alibaba's IPO, helping to draft and disseminate the Registration Statement and solicit

12  investors to purchase Alibaba securities issued pursuant thereto.

13     53.    Defendant Mizuho Securities USA Inc. ("Mizuho") is a financial services company that

14  acted as an underwriter for Alibaba's IPO, helping to draft and disseminate the Registration Statement

15  and solicit investors to purchase Alibaba securities issued pursuant thereto.  Mizuho maintains offices in

16  San Francisco, California.

17     54.    Defendant Pacific Crest Securities LLC, the technology specialist division of KeyBanc

18  Capital Markets Inc., is a financial services company that acted as an underwriter for Alibaba's IPO,

19  helping to draft and disseminate the Registration Statement and solicit investors to purchase Alibaba

20  securities issued pursuant thereto. Pacific Crest Securities LLC has offices in San Francisco, California.

21     55.    Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel") is a financial services

22  company that acted as an underwriter for Alibaba's IPO, helping to draft and disseminate the

23  Registration Statement and solicit investors to purchase Alibaba securities issued pursuant thereto.

24  Stifel is headquartered in St. Louis, Missouri and maintains offices in San Francisco, California.

25     56.    Defendant Wells Fargo Securities, LLC is a financial services company that acted as an

26  underwriter for Alibaba's IPO, helping to draft and disseminate the Registration Statement and solicit

27  investors to purchase Alibaba securities issued pursuant thereto. Wells Fargo Securities, LLC is

28  headquartered in San Francisco, California.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

57.     Defendant BNP Paribas Securities Corp. is a financial services company that acted as an underwriter for Alibaba's IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase Alibaba securities issued pursuant thereto.  BNP Paribas Securities Corp. has offices in San Francisco, California

58.     Defendant Evercore Group LLC is a financial services company that acted as an underwriter for Alibaba's IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase Alibaba securities issued pursuant thereto.  Evercore Group LLC maintains offices in the United States, including San Francisco and Menlo Park, California

59.     Defendant Raymond James & Associates, Inc. is a financial services company that acted as an underwriter for Alibaba's IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase Alibaba securities issued pursuant thereto.

60.     Defendant SunTrust Robinson Humphrey, Inc. is a financial services company that acted as an underwriter for Alibaba's IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase Alibaba securities issued pursuant thereto.  SunTrust maintains offices in San Francisco, California.

61.     Defendant BHF-BANK Aktiengesellschaft LLC ("BHF-BANK") is a financial services company that acted as an underwriter for Alibaba's IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase Alibaba securities issued pursuant thereto.  BHF-BANK has offices in Long Beach, California.

62.     Defendant CIMB Securities Limited is a financial services company that acted as an underwriter for Alibaba's IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase Alibaba securities issued pursuant thereto.

63.     Defendant China Merchants Securities (HK) Co., Limited is a financial services company that acted as an underwriter for Alibaba's IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase Alibaba securities issued pursuant thereto.

64.     Defendant ING Financial Markets LLC is a financial services company that acted as an underwriter for Alibaba's IPO, helping to draft and disseminate the Registration Statement and solicit

1  investors to purchase Alibaba securities issued pursuant thereto.  ING Financial Markets LLC has

2  offices in Los Angeles, California.

3      65.    Defendant Needham & Company LLC is a financial services company that acted as an

4  underwriter for Alibaba's IPO, helping to draft and disseminate the Registration Statement and solicit

5  investors to purchase Alibaba securities issued pursuant thereto.  Needham & Company LLC has

6  offices in San Francisco and Menlo Park, California.

7      66.    Defendant Nomura Securities International, Inc. ("Nomura Securities") is a financial

8  services company that acted as an underwriter for Alibaba's IPO, helping to draft and disseminate the

9  Registration Statement and solicit investors to purchase Alibaba securities issued pursuant thereto.

10  Nomura Securities has offices in San Francisco, California.

11     67.    Defendant Raine Securities LLC is a financial services company that acted as an

12  underwriter for Alibaba's IPO, helping to draft and disseminate the Registration Statement and solicit

13  investors to purchase Alibaba securities issued pursuant thereto.

14     68.    Defendant RBS Securities Inc. LLC ("RBS Securities") is a financial services company

15  that acted as an underwriter for Alibaba's IPO, helping to draft and disseminate the Registration

16  Statement and solicit investors to purchase Alibaba securities issued pursuant thereto.  RBS Securities

17  has offices in San Francisco, California.

18     69.    Defendant SG Americas Securities LLC is a financial services company that acted as an

19  underwriter for Alibaba's IPO, helping to draft and disseminate the Registration Statement and solicit

20  investors to purchase Alibaba securities issued pursuant thereto.  SG Americas Securities LLC has

21  offices in Santa Monica, California.

22     70.    Defendant C.L. King & Associates, Inc. is a financial services company that acted as an

23  underwriter for Alibaba's IPO, helping to draft and disseminate the Registration Statement and solicit

24  investors to purchase Alibaba securities issued pursuant thereto.

25     71.    Defendant Lebenthal & Co. is a financial services company that acted as an underwriter

26  for Alibaba's IPO, helping to draft and disseminate the Registration Statement and solicit investors to

27  purchase Alibaba securities issued pursuant thereto.  Lebenthal & Co. has offices in Los Angeles,

28  California.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1  72. Defendant Mischler Financial Group, Inc. is a financial services company that acted as

2 an underwriter for Alibaba's IPO, helping to draft and disseminate the Registration Statement and

3 solicit investors to purchase Alibaba securities issued pursuant thereto. Mischler Financial Group, Inc.

4 has offices in Newport Beach, California.

5  73. Defendant Samuel A. Ramirez & Company, Inc. is a financial services company that

6 acted as an underwriter for Alibaba's IPO, helping to draft and disseminate the Registration Statement

7 and solicit investors to purchase Alibaba securities issued pursuant thereto. Samuel A. Ramirez &

8 Company, Inc. has offices in Los Angeles, California.

9  74. Defendant Topeka Capital Markets Inc. is a financial services company that acted as an

10 underwriter for Alibaba's IPO, helping to draft and disseminate the Registration Statement and solicit

11 investors to purchase Alibaba securities issued pursuant thereto. Topeka Capital Markets Inc. has

12 offices in San Francisco, California.

13  75. Defendant The Williams Capital Group, L.P. is a financial services company that acted

14 as an underwriter for Alibaba's IPO, helping to draft and disseminate the Registration Statement and

15 solicit investors to purchase Alibaba securities issued pursuant thereto.

16  76. The defendants named above in ¶¶42-75 are referred to herein as the "Underwriter

17 Defendants." Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and

18 misleading statements in the Registration Statement as follows:

19    (a) The Underwriter Defendants are investment banking houses that specialize, *inter*

20 *alia*, in underwriting public offerings of securities. They served as the underwriters of the IPO and

21 shared tens of millions of dollars in fees collectively. The Underwriter Defendants arranged a multi-

22 city roadshow prior to the IPO during which they, and representatives from Alibaba, met with potential

23 investors and presented highly favorable information about the Company, its operations and its financial

24 prospects.

25    (b) The Underwriter Defendants also demanded and obtained an agreement from

26 Alibaba that Alibaba would indemnify and hold the Underwriter Defendants harmless from any liability

27 under the federal securities laws. They also made certain that Alibaba had purchased millions of dollars

28 in directors' and officers' liability insurance.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

(c)     Representatives of the Underwriter Defendants also assisted Alibaba and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Alibaba, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Alibaba's operations and financial prospects.

(d)     In addition to availing themselves of virtually unlimited access to internal corporate documents, agents of the Underwriter Defendants met with Alibaba's lawyers, management and top executives, and engaged in "drafting sessions" between at least May and September 2014. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Alibaba shares would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Alibaba would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Alibaba's management and top executives, the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, Alibaba's existing problems as detailed herein.

(e)     The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the offers and sales of securities registered thereby, including those to plaintiff and the other members of the Class.

77.     The true names and capacities of defendants sued herein under California Code of Civil Procedure §474 as Does 1 through 25, inclusive, are presently not known to plaintiff, who therefore sues these defendants by such fictitious names. Plaintiff will seek to amend this Complaint and include these Doe defendants' true names and capacities when they are ascertained. Each of the fictitiously named defendants is responsible in some manner for the conduct alleged herein and for the injuries suffered by the Class (as defined herein).

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

## DEFENDANTS' FALSE AND MISLEADING
## REGISTRATION STATEMENT AND PROSPECTUSES

78.     On May 6, 2014, Alibaba filed with the SEC a confidential draft Registration Statement on Form F-1, which would be used for the IPO following several amendments in response to SEC comments, including comments from the SEC emphasizing the importance of adequately disclosing material trends and risk factors, as required by Items 303 and 503.

79.     On September 15, 2014, Alibaba filed the seventh and final amendment to the Registration Statement, which registered 368,122,000 Alibaba ADS shares for public sale. The SEC declared the Registration Statement effective on September 18, 2014. On or about September 19, 2014, Alibaba priced the IPO at $68 per ADS and filed the final Prospectus for the IPO on September 22, 2014, which forms part of the Registration Statement.

80.     Analyst coverage over the following weeks and months was ecstatic. For example, on September 22, 2014, analysts with MKM Partners issued a report entitled "Alibaba Group Holding Ltd. . . . Powerhouse in Best Secular Growth Market for eCommerce," which initiated coverage at a target price nearly 50% above the offering price as follows:

> Following the ***record-setting IPO*** on Friday, we are initiating coverage of BABA with a Buy rating and a 12-month target price of $125. . . . China's eCommerce economy is ***booming*** . . . . BABA's market position is ***dominant*** . . . . This is a ***highly profitable*** business model.

81.     On October 8, 2014, analysts with Macquarie Research issued a report entitled "Alibaba Group Holdings – Doors wide open," which stated:

> Following years of anticipation with much fanfare in recent memory, Alibaba was finally listed on NYSE at a valuation of US$168bn (closed at US$232bn on Day 1 of trading). ***There has never been a bigger company in the private sector around the world on the day of their IPO***.

82.     On October 29, 2014, analysts with Credit Suisse initiated coverage of Alibaba, issuing a report entitled "Alibaba Group – The giant marches on," which stated:

> Still ample upside potential despite the ***44% post-IPO rally***. We initiate coverage on Alibaba Group with an OUTPERFORM rating and a target price of US$114. We forecast a ~37% revenue CAGR over the next three years . . . . This revenue growth, combined with the ***incomparable scalability*** (***it is the largest e-commerce ecosystem in the world***) and operating leverage should help the company deliver sustainable earnings in the coming years.

- 15 -

83.     Notwithstanding the successful IPO, the Registration Statement contained untrue statements of material fact and omitted to state material facts both required by governing regulations and necessary to make the statements made not misleading. In particular, the Registration Statement failed to disclose that just two months prior, on July 16, 2014, senior executives from Alibaba had met with senior Chinese government regulators and officials, who explained that Alibaba's e-commerce businesses were in serious violation of the laws and regulations of the People's Republic of China ("PRC"). Alibaba's undisclosed illegal practices included, for example:

- the sale of counterfeit goods, including fake cigarettes, alcohol and name brand handbags, by vendors on Alibaba's third-party marketplace platform;

- the sale of restricted weapons and other prohibited good items on Alibaba's third-party marketplace platform;

- that Alibaba employees had received bribes from merchants and others seeking to increase their search rankings and to get advertising space;

- that Alibaba failed to stop merchants from using tactics such as false and misleading advertising; and

- accused Alibaba of alleged anticompetitive behavior such as forbidding merchants to participate in rival sites' promotions.

84.     The Registration Statement also failed to disclose that Chinese regulators and officials had threatened Alibaba with thousands of financial penalties – each with a target of 1.0% of daily sales on its e-commerce platforms, and that the SAIC had already commenced the "Red Shield Web Sword" special program to clean up rampant abuses on e-commerce platforms, including counterfeiting and consumer fraud, with Alibaba as one of its main targets.

85.     The Registration Statement also purported to warn of numerous risks that "*if*" occurring "*might*" or "*could*" adversely affect the Company while failing to disclose that these very "risks" had already materialized at the time of the IPO. For example, the Registration Statement stated the following:

- "the regulatory and legal system in China is complex and developing, and future regulations may impose additional requirements on our business."

- "[m]aintaining the trusted status of our ecosystem is critical to our success, and any failure to do so could severely damage our reputation and brand, which would have a material adverse effect on our business, financial condition and results of operations."

- 16 -

- "ability to maintain our position as a trusted platform for online and mobile commerce is based in large part upon: . . . the quality and breadth of products and services offered by sellers through our marketplaces; [and] the strength of our consumer protection measures."

86.     Each of these statements were materially false and misleading and failed to disclose:

(a)     Alibaba's already occurring but undisclosed illegal practices and the severe regulatory scrutiny drawn thereby was already likely to (and in fact did) materially and adversely affect Alibaba's future results and prospects as well as the purportedly "trusted" status of its ecosystem; and

(b)     Alibaba was then already the subject of administrative law enforcement action for, *inter alia*, facilitating the rampant sale of counterfeit goods and restricted or illegal weapons, accepting bribes from merchants in exchange for improved search rankings and advertising results, consciously disregarding fake transactions and thereby allowing the false inflation reported sales volume, and obviously anticompetitive behavior such as forbidding merchants from participating in rival platform promotions, all of which created imminent and material risks to its business operations, and which likely would have a material effect on its revenue, income and share price, as well as the expected adverse consequences therefrom.

87.     The Registration Statement also made the following materially false and misleading statements regarding the sale of fake or infringed goods on its online marketplace and employee acceptance of bribes from merchants:

We have received in the past, and we anticipate we will receive in the future, communications alleging that items offered for sold through our online marketplaces by third parties or that we make available through other services, such as our online music platform, infringe third-party copyrights, trademarks and patents or other intellectual property rights. Although we have adopted measures to verify the authenticity of products sold on our marketplaces and minimize potential infringement of third-party intellectual property rights through our intellectual property infringement complaint and take-down procedures, these measures may not always be successful. We have been and may continue to be subject to allegations of civil or criminal liability based on allegedly unlawful activities carried out by third parties through our online marketplaces. We also have been and may continue to be subject to allegations that we were participants in or facilitators of such allegedly unlawful activities.

*            *            *

Moreover, illegal, fraudulent or collusive activities by our employees could also subject us to liability or negative publicity. For instance, we learned that in early 2011 and 2012 in two separate incidents, certain of our employees had accepted payments from sellers in order to receive preferential treatment on Alibaba.com and Juhuasuan. Although we dismissed the employees responsible for the incidents and have taken

- 17 -

action to further strengthen our internal controls and policies with regard to the review and approval of seller accounts, sales activities and other relevant matters, we cannot assure you that such controls and policies will prevent fraud or illegal activity by our employees or that similar incidents will not occur in the future.  Any such illegal, fraudulent or collusive activity could severely damage our brand and reputation as an operator of trusted marketplaces, which could drive users and buyers away from our marketplaces, and materially and adversely affect GMV transacted on our marketplaces, our revenues and our net income.

88.     Each of the above statements were materially false and misleading because defendants failed to disclose the following facts:

(a)     the SAIC and China's provincial and local Administrations of Industry and Commerce ("AICs") had recently accused Alibaba of currently violating applicable laws and regulations in the conduct of its e-commerce platforms at the July SAIC meeting and Alibaba faced imminent and severe monetary and other regulatory penalties as a result if such violations were not remedied; and

(b)     Alibaba employees were continuing to engage in illegal activities, such as accepting bribes from market sellers for higher search placement or better reviews on its e-commerce platforms, and the SAIC had recently threatened to fine Alibaba 1% of daily sales volume or more if it did not sufficiently strengthen its internal controls and policies to prevent such illegal activity.

89.     The Registration Statement also stated the following with respect to laws and regulations governing the Company's business practices:

China has enacted laws and regulations governing Internet access and the distribution of products, services, news, information, audio-video programs and other content through the Internet.  The PRC government has prohibited the distribution of information through the Internet that it deems to be in violation of PRC laws and regulations. If any of the information disseminated through our marketplaces and websites were deemed by the PRC government to violate any content restrictions, we would not be able to continue to display such content and could become subject to penalties, including confiscation of income, fines, suspension of business and revocation of required licenses, which could materially and adversely affect our business, financial condition and results of operations.

*     *     *

For example, under applicable consumer protection laws in China, e-commerce platform operators may be held liable for consumer claims relating to damage if they are unable to provide consumers with the true name, address and contact details of sellers or service providers.  In addition, if we do not take appropriate remedial action against sellers or service providers for actions they engage in that we know, or should have known, would infringe upon the rights and interests of consumers, we may be held jointly liable with the seller or service provider for such infringement.  Moreover,

- 18 -

applicable consumer protection laws in China hold that trading platforms will be held liable for failing to meet any undertakings such platforms make to consumers with regard to products listed on their websites. Furthermore, we are required to report to SAIC or its local branches any violation of applicable laws, regulations or SAIC rules by sellers or service providers, such as sales of goods without proper license or authorization, and to take appropriate remedial measures, including ceasing to provide services to such sellers or service providers. If claims are brought against us under any of these laws, we could be subject to damages and reputational damage as well as action by regulators, which could have a material adverse effect on our business, financial condition and results of operations.

90.      Each of these statements were materially false and misleading and failed to disclose that the SAIC and AICs findings and administrative guidance delivered at the July SAIC meeting that Alibaba was in violation of PRC consumer laws and regulations and had been systematically engaging in unfair trade practices on its e-commerce platforms. The SAIC also criticized Alibaba for providing assistance to vendors in violating consumer laws, and, moreover, the SAIC had told Alibaba to immediately institute remedial measures or else face severe monetary penalties.

91.      The Registration Statement also stated with respect to the sale of counterfeit products and engagement in fictitious transactions:

*Measures against counterfeit products.*  To protect consumers, brand owners and legitimate sellers and to maintain the integrity of our marketplaces, we have put in place a broad range of measures to prevent counterfeit and pirated goods from being offered and sold on our marketplaces.  These measures include:

- identifying, issuing warnings and taking down counterfeit products from our marketplaces;

- providing an online complaint platform for brand owners to report infringements;

- conducting random checks by using third parties to purchase suspected counterfeit products; and

- enhancing our communication with various relevant government authorities to eradicate sources of counterfeit goods.

We have also established cooperative relationships with over 1,000 major brand owners and several industry associations in connection with intellectual property rights protection to enhance the effectiveness of our take-down procedures and other anti-counterfeiting measures.

*Measures against fictitious transactions.*  We have implemented measures to prevent, detect and reduce the occurrence of fictitious transactions on Taobao Marketplace and Tmall including:

- requiring the use of sellers' real identities to set up accounts with us;

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1          •    analyzing transaction patterns to identify anomalies;

2          •    dynamic password protection and real-time monitoring of user login
                behavior; [and]

3

4          •    maintaining a "blacklist" of sellers and buyers who have been involved
                in fictitious transactions in the past.

5          92.    Each of the above statements were materially misleading and failed to disclose the

6    following true facts, including that:

7          (a)    the SAIC and AICs had already warned Alibaba that the measures taken to

8    prevent counterfeit products were ineffective;

9          (b)    the SAIC had found that Alibaba had in many cases obstructed enforcement

10   investigations and informed vendors to the SAIC and AICs enforcement actions permitting illegal

11   vendors to avoid sanctions;

12         (c)    a material portion of Alibaba's consolidated revenues and earnings were derived

13   from the sale of fake or non-genuine merchandise;

14         (d)    that Alibaba's financial performance was reasonably likely to be materially

15   impacted in order to comply with applicable regulations; and

16         (e)    the SAIC had already informed Alibaba during the July SAIC meeting that its

17   measures to prevent fictitious transactions were  not effective and that as a result its e-commerce

18   platforms were in violation of PRC laws and regulations.

19         93.    The Registration Statement also falsely stated that the Company had a zero tolerance

20   policy regarding counterfeit products and phony sales on its sales platforms:

21         ***We maintain a "no tolerance" policy with regard to counterfeit and fictitious
           activities on our marketplaces.*** However, because many sellers doing business on our

22         marketplaces depend on us for their livelihood, we have generally eschewed a "shoot-
           first, ask questions later" approach to handling complaints.   When we receive

23         complaints or allegations regarding infringement or counterfeit goods, we follow well-
           developed procedures to verify the nature of the complaint and the relevant facts before

24         de-listing the items.  Generally, we give sellers who have been accused of posting or
           selling counterfeit products up to three days to refute the allegations and provide

25         evidence of the authenticity of the product.

26         If allegations of posting or selling counterfeit products have not been refuted
           or fictitious activities have been confirmed, we penalize the parties involved through a

27         number of means including:

28         •    immediately delisting the products;

                                    - 20 -

- arranging for the seller to reimburse the buyer;

- assessing penalty points against the seller or limiting its ability to add listings for a certain period;

- adopting a "name and shame" policy;

- imposing restrictions from participation in promotional activities on our marketplaces; and

- closing down storefronts and, for Tmall sellers, confiscating the consumer protection security deposits paid.   The seller is banned permanently from establishing another storefront on our marketplaces.

> In appropriate circumstances we also notify the relevant law enforcement and other authorities to take legal action against the offending party, including in extreme cases criminal proceedings.

94.     Each of these statements were materially false and misleading because Alibaba did not employ a "no tolerance" policy with regard to counterfeit and fictitious activities on its marketplaces. As reported, Alibaba in fact did tolerate the sale of inauthentic goods on its web platforms and either permitted or turned a blind eye to fictitious transactions on its e-commerce platforms.  Even after Alibaba was sued by a brand owners, Alibaba often continued to allow counterfeit sales on its e-commerce platforms.  Indeed, Taobao had optimized its search engines to specifically search and identify counterfeit vendors, *e.g.*, via the euphemism "Replica."  The foregoing statements were also misleading for failing to disclose to investors that the SAIC had already launched the "Red Shield Web Sword" initiative, which targeted Alibaba, and, moreover, had notified Alibaba, at the July SAIC meeting, that its rampant facilitation of counterfeit sales on its e-commerce platforms would result in severe financial penalties unless promptly remedied.

95.     The Registration Statement made the following false and misleading statements regarding regulatory framework governing the Company's business while failing to disclose that the Company was in active violation of the applicable regulations:

**Regulation of Advertising Services**

The principal regulations governing advertising businesses in China are:

- The Advertising Law of the PRC (1994);

- The Advertising Administrative Regulations (1987);

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

- • The Implementing Rules for the Advertising Administrative Regulations (2004); and

- • The Administration Rules of Foreign-invested Advertising Enterprises (2008).

\*       \*       \*

Applicable PRC advertising laws, rules and regulations contain certain prohibitions on the content of advertisements in China (including prohibitions on misleading content, superlative wording, socially destabilizing content or content involving obscenities, superstition, violence, discrimination or infringement of the public interest). Advertisements for anesthetic, psychotropic, toxic or radioactive drugs are prohibited, and the dissemination of advertisements of certain other products, such as tobacco, patented products, pharmaceuticals, medical instruments, agrochemicals, foodstuff, alcohol and cosmetics, are also subject to specific restrictions and requirements.

. . . Violation of these laws, rules and regulations may result in penalties, including fines, confiscation of advertising income, orders to cease dissemination of the advertisements and orders to publish an advertisement correcting the misleading information.

\*       \*       \*

**Regulation of Online and Mobile Commerce**

China's online and mobile commerce industry is at an early stage of development and there are few PRC laws, regulations or rules specifically regulating this industry. The SAIC adopted the Interim Measures for the Administration of Online Commodities Trading and Relevant Services on May 31, 2010 and replaced those measures with the Administrative Measures for Online Trading on January 26, 2014, which became effective on March 15, 2014. The SAIC also issued the Opinions on Strengthening the Administration of Online Group Buying Operations on March 12, 2012 to subject group buying website operators to the foregoing measures, especially those relating to marketplace platform service providers. These newly issued measures impose more stringent requirements and obligations on the online trading or service operators as well as the marketplace platform providers. For example, the marketplace platform providers are obligated to examine the legal status of each third-party merchant selling products or services on the platform and display on a prominent location on the web page of such merchant the information stated in the merchant's business license or a link to such business license, and a group buying website operator must only allow a third-party merchant with a proper business license to sell products or services on its platform. Where the marketplace platform providers also act as online distributors, these marketplace platform providers must make a clear distinction between their online direct sales and sales of third-party merchant products on the marketplace platform.

96.    Each of the above statements were materially false and misleading as they failed to disclose the following true facts:

- 22 -

1         (a)    that the SAIC had recently commenced the "Red Shield Web Sword" special

2    program to more strictly enforce consumer protection, false advertising, and intellectual property laws

3    and regulations more strictly;

4         (b)    the SAIC and AICs had already delivered administrative guidance and informed

5    Alibaba senior management at the July SAIC meeting that the advertising on its websites was in

6    violation of PRC laws and regulation and that if Alibaba did not remedy the violations

7    immediately, it would be subject to significant financial penalties; and

8         (c)    the SAIC already found that Alibaba had facilitated illegal vendors operating

9    on Alibaba's e-commerce platforms without necessary business licenses or under false names using

10   another business' license, and that as a result Alibaba faced severe monetary penalties if it failed to

11   remedy the violations.

12       97.    Defendants were required to disclose all of the foregoing misrepresented and omitted

13   information in the Registration Statement for three independent reasons.  First, Item 303 required

14   disclosure of any known events or uncertainties that at the time of the IPO had caused or were

15   reasonably likely to cause Alibaba's disclosed financial information not to be indicative of future

16   operating results.  Alibaba's then occurring but undisclosed illegal practices and the severe regulatory

17   scrutiny drawn thereby were likely to (and in fact did) materially and adversely affect Alibaba's future

18   results and prospects.

19       98.    Second, Item 503 required, in the "Risk Factor" section of the IPO Registration

20   Statement, a discussion of the most significant factors that make the offering risky or speculative and

21   that each risk factor adequately describe the risk.  Alibaba's discussions of risk factors did not

22   adequately describe the risk posed by Alibaba's already occurring illegal practices and the severe

23   regulatory scrutiny drawn thereby, nor the likely and consequent material adverse effects on the

24   Company's future results and prospects.

25       99.    Third, defendants' failure to disclose that Alibaba was then the subject of administrative

26   law enforcement proceedings that created imminent and material risk to its business operations, and

27   thus which likely would have a material effect on its revenue, income and share price, as well as the

28   expected adverse consequences therefrom, rendered false and misleading the Registration Statement's

1   many references to known risks that "*if*" occurring "*might*" or "*could*" adversely affect the Company.

2   These "risks" had already materialized at the time of the IPO.

3       100.   With this host of misrepresentations and omissions, the IPO was extremely lucrative for

4   defendants, who raised more than $25 billion in gross proceeds.   And in the weeks and months

5   following, the price of Alibaba ADS shares shot up to trade at $120 per share.

6       101.   But when the truth materialized, Alibaba shares plummeted.   For example, on January

7   28, 2015, before the opening of trading, various members of the financial media reported that SAIC,

8   China's main corporate regulator, had released a white paper accusing Alibaba of engaging in the very

9   illegal conduct disclosed to Alibaba executives in July 2014.

10

11       102.   On January 28, 2015, *The Wall Street Journal*, whose reporters had reviewed the SAIC

12   white paper, reported as follows:

13       The Chinese government accused e-commerce giant Alibaba of failing to crack down on
    the sale of fake goods, bribery and other illegal activity on its sites in a rare public

14       dispute with one of the country's most prominent companies.

15                              *         *         *

16       Alibaba has long grappled with allegations that Taobao, its biggest e-commerce
    platform, is rife with counterfeit goods. ***The accusations from the Chinese government***

17   ***could lend further force to those complaints and damage Alibaba's reputation among
    investors and brands overseas, while the highly public spat could hurt the company's***

18   ***relationship with the government, experts warn.***

19         The government's accusations are in a white paper made public on Wednesday
    by China's State Administration for Industry and Commerce, ***but based on***

20   ***conversations between the agency and Alibaba officials in July***. That was two months
    before Alibaba's U.S. IPO, which valued the Chinese company at more than $230

21   billion. ***In the paper, the agency said it held off on disclosing details of the talk so as
    not to affect the IPO***.

22                              *         *         *

23

24         ***The report said the problems had grown to become Alibaba's "greatest
    credibility crisis" since the company was established. Citing a Chinese phrase that
    refers to letting a small problem fester, the paper said, "for a long time, [Alibaba]***

25   ***didn't pay sufficient attention to the issue and didn't adopt effective measures,
    causing a neglected carbuncle to become the bane of its life."***

26

27

28

103.     On this news, the price of Alibaba ADS's dropped 4%, or $4.49 per ADS, closing at $98.45 per ADS on January 28, 2015, on unusually high volume of approximately 42 million shares trading.

104.     Then, on January 29, 2015, Alibaba issued a press release announcing mixed financial results for 4Q14, and addressing the SAIC white paper.

105.     Market analysts reacted negatively.  For example, on January 28, 2015, analysts with Deutsche Bank issued a report stating:

**SAIC claims abuses of Alibaba platform**

China's State Administration for Industry & Commerce (SAIC) recently issued a report claiming malpractice on several fronts, including: 1) insufficient control of merchants on Taobao, some of which do not hold proper licenses, 2) a lack of controls around **counterfeit products, illegal products**, and **products that infringe upon trademarks**, 3) insufficient attention to **misleading sales promotions** (specifically the Double 11 & 12 events) and **even instances of bribery**, 4) flaws in the platform's merchant credit rating and comment mechanism, leading to **fake transactions** and the deletion of negative comments, 5) Taobao **staff assisting illegal and unauthorized stores to avoid govt inspection**, 6) the lack of a proper merchant black-listing mechanism, and 7) a lack of transparency into merchant data, leading to difficulties in investigating illegal activities.

**Delay in report publishing**

The report was prepared based on a meeting between govt business regulators and Alibaba in July 2014. ***The SAIC claims it had delayed the release of the report to avoid affecting Ali's IPO***. This news may cause near term weakness in the stock and is a situation we will monitor closely. ***We find the timing*** **of these actions somewhat interesting**.

106.     On January 29, 2015, analysts with BMO Capital Markets issued a report stating:

The company delivered a mixed performance with overall revenues and take rate lighter than expected. Mobile GMV, mobile revenues, Taobao GMV, and active buyers were all better than expected,, [sic] operating expenses were lower than expected, and adjusted EBITDA was higher than expected.  We believe the selloff of the shares following the earnings release was driven primarily driven [sic] by the lower-than-expected revenues and by a white paper posted by the State Administration for Industry and Commerce alleging that Alibaba has not done enough to combat the sale of counterfeit products by some of its sellers.

\*          \*          \*

We are lowering our price target on BABA to $110 (from $125), reflecting a lower target multiple, owing primarily to the increased uncertainty around the regulatory outlook for the company, coupled with the slower-than-expected revenue growth.

- 25 -

1      107.    On these developments, the price of Alibaba ADS shares dropped another $8.64 per

2   share to close at $89.81 per share on January 29, 2015, a one-day decline of approximately 9%, again

3   on extremely high volume of more than 76.3 million shares trading.

4
       108.    On January 30, 2015, analysts with Rosenblatt Securities Inc. issued a report stating:
5
       We believe the battle between Alibaba and SAIC might escalate, which will put near-
6      term pressure on the company.

7                                    *       *       *

8              **SAIC basically said in their white paper** that based on a sample of products
       collected on the Taobao platform (as well as other eCommerce platforms) conducted
9      between August and October 2014, **approximately 63% were not authentic**.

10     109.    On January 30, 2015, analysts with Evercore ISI issued a report lowering its target as

11  follows:

12     [T]he uncertainty on how the SAIC complaint gets resolved and the timing is something
       we must recognize in shares.  As such, on roughly similar estimates, we are trimming
13     our target to $115 from $130.

14     110.    On February 2, 2015, analysts with Trefis issued a report stating as follows:

15             [An] area that disconcerted market participants is the negative news pertaining to
       recent criticism of Alibaba from the Chinese regulator 'State Administration for
16     Industry and Commerce' (SAIC).  Authorities are critical of the company for not doing
       enough to limit sale of counterfeit products on its marketplaces.  While the report has
17     now been taken down from the regulator's website, **we believe this development will
       impact growth** on Alibaba's Taobao marketplace in the near-term, as we expect the
18     company to now move quickly in removing counterfeit products on its sites, and this
       could lead to closure of a large number of seller accounts.  In addition, **since Alibaba
19     provided little information about its July 2014 meeting with SAIC in its IPO
       documents, it could also cause legal issues for the company**.

20     111.    On March 2, 2015, *The Wall Street Journal* published an expose entitled "Inside

21  Alibaba, the Sharp-Elbowed World of Chinese E-Commerce; Merchants use fake orders, shell

22  storefronts to gain prominence on Alibaba's marketplaces," which stated:

23             When Mr. Cui, an entrepreneur in the southeastern Chinese city of Hangzhou,
       wanted to draw more attention to the hair clips and costume jewelry he sold on the
24     shopping sites of e-commerce giant Alibaba Group Holding Ltd., he says he turned to
       fake orders.
25
               Faking orders, or "brushing," as it is called in China, involves paying people to
26     pretend to be customers. It lets vendors pad their sales figures and, in theory, boost their
       standing on online marketplaces, which often give more prominence to high-volume
27     sellers with good track records.

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1   Typically, vendors pay brushers the cost of the products they are ordering, plus a fee. The brushers place the orders and make payments using that money. The vendors then ship boxes that are empty or full of worthless trinkets, while the brushers write glowing reviews.

2

3

4   The practice is considered a form of false advertising, which is prohibited in the U.S. and China. Chinese sellers found doing so face fines and restrictions on their business. But Mr. Cui, who asked to be identified only by his last name, said he relied on fake orders because he felt there was no other way for his products to be seen.

5

6   Brushing puts Alibaba at risk of further regulatory scrutiny following its $25 billion initial public offering in September, and calls into question the volume of transactions actually conducted on its platforms, a metric analysts cite in saying it is the world's largest e-commerce platform.

7

8

9   112.   On these and other reports of counterfeiting and fake orders, the price of Alibaba ADS

10  shares dropped nearly 6% on high volume to trade at prices as low as $80.03 on March 3, 2015.

11  113.   These concerns reverberated throughout the market. For example, on March 10, 2015,

12  an article by TheStreet.com entitled "Alibaba Can't Seem to Shake Its Counterfeit Products Problem"

13  documented and echoed market concerns as follows:

14  Alibaba has been tumbling … and it doesn't appear that a turnaround is in the immediate future.

15  The downward spiral can be attributed to a number of different causes, but one major problem is the Hangzhou, China-based e-commerce company's struggles with counterfeit and regulatory issues. . . .

16

17  Alibaba's misfortunes were amplified in January when the Chinese government accused the company of allowing fake goods to be sold on its site and failing to sufficiently regulate illegal activity. China's State Administration for Industry and Commerce then published a white paper detailing the accusation, but soon retracted it after Alibaba claimed it was false. Alibaba chairman Jack Ma met with the head of China's commerce regulator to smooth things over.

18

19

20

21  *But that wasn't the end of it.* Earlier this month *The Wall Street Journal* reported on a common illegal practice in China called "brushing," in which sellers use fake customers to inflate sales numbers, improperly improving their online status. According to the Journal, Alibaba uses "sophisticated tools" to counter-brush, but the practice is hard to detect, *calling into question the large volume of transactions reportedly taking place on the e-commerce site.*

22

23

24  Alibaba's Vice President Yu Weimin even admitted to the high percentage of brushing on the site. In November, he told China's state-run Xinhua News Agency that in 2013, 1.2 million sellers or *about 17% of all merchants on Taobao, Alibaba's main shopping site, had faked 500 million transactions* (worth 10 billion Yuan, or about $1.6 billion USD). This, he explained, was a "conservative estimate."

25

26

27  Following the controversy over fake goods, Alibaba yesterday decided to dismiss Wang Yulei , the head of Tmall.com (the business-to-consumer version of Taobao), from his role and reassign him elsewhere.

28

- 27 -

114.    On May 15, 2015, Kering S.A., parent company of Gucci, Yves St. Laurent and other luxury brands, filed a federal lawsuit in the Southern District of New York naming Alibaba as a defendant and alleging in great detail as follows:

> The Alibaba Defendants *facilitate and encourage the sale of an enormous number of Counterfeit Products through their self-described "ecosystem,"* which provides manufacturers, sellers, and buyers of counterfeit goods with a marketplace for such goods, and provides online marketing, credit card processing, financing, and shipping services that effectuate the sale of the Counterfeit Products.

115.    On these developments, the price for Alibaba ADS shares dropped nearly 3% from a high of $88.96 on May 15, 2015 to as low as $86.61 on the very next trading day, May 18, 2015.

116.    On August 15, 2015, analysts with Trefis issued a report reiterating lasting market risk and concern related to the SAIC white paper, criticizing Alibaba as follows:

> Alibaba recently received criticism from the Chinese regulator 'State Administration for Industry and Commerce' (SAIC) for *not doing enough to curtail sale of counterfeit products on its marketplaces*. Though this report was taken down from the regulator's website, *we believe this development could impact growth on Alibaba's Taobao marketplace in the near-term*, as we expect the company to now move quickly in removing counterfeit products on its sites, and this could lead to closure of a large number of seller accounts.

117.    On August 27, 2015, analysts with Nomura reported that Chinese regulators would begin a crackdown on grey-market "daigou" imports and exports, which would negatively impact large scale merchants on Alibaba's Taobao online marketplace. The report stated in part:

> According to Sohu News . . . starting from September 1, China's customs will strengthen its control of private "daigou" business by increasing the number of staff used to check international postal packages and the luggage of citizens returning into the country from abroad. Checks with Taobao merchants seem to suggest that the inspection process for parcels has been tightened in recent months, and that some parcels have been detained by customs.
>
>           *        *        *
>
> We think grey-market imports will be at less than 5% of Alibaba's . . . total GMV in 2015. China customs' stricter inspection may potentially raise the cost for "daigou" merchants and lower their competitiveness against the cross-border B2C players. We believe the crackdown will impact on Taobao's GMV . . . .

118.    On August 31, 2015, analysts with Deutsche Bank issued a report titled "Insights into platform clean-up," which echoed the same concerns as follows:

> We have spent the past several days undertaking "grassroots-level" discussions with a host of merchants and customers on the Alibaba domestic retail platforms. *Our main take-aways relate to . . . the heightened cleansing of the platform, which we*

- 28 -

*trace to the beginning of 2015. We however reduce GMV as a result* of progress in this area . . . .

**Cleaning up user, merchant experience; some sacrifice of GMV in order**

We cut GMV assumptions in the wake of extensive channel checks with platform customers and merchants, which indicate measurable progress against brushing, counterfeiting and other untoward practices. These measures . . . limit . . . our GMV outlook.

119. On these developments, the price of Alibaba declined dramatically from a high of $71.59 per share on August 27, 2015 to as low as $ 64.05 per share on September 1, 2015, an over 10% decline on high volume.

120. As of September 24, 2015, Alibaba shares traded below $60 per share, a decline of over 50% from the approximate $120 per share high, indeed well over 10% below the $68 per share IPO price. All told, Alibaba's misleading Registration Statement has already caused billions of dollars in investor losses.

## CLASS ACTION ALLEGATIONS

121. Plaintiff brings this action as a class action on behalf of all those who purchased Alibaba ADS shares pursuant or traceable to the Registration Statement issued in connection with the IPO (the "Class"). Excluded from the Class are defendants and their families, the officers and directors and affiliates of defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

122. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Alibaba or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

123. Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1   124.   Plaintiff will fairly and adequately protect the interests of the members of the Class and

2   has retained counsel competent and experienced in class and securities litigation.

3   125.   Common questions of law and fact exist as to all members of the Class and predominate

4   over any questions solely affecting individual members of the Class.  Among the questions of law and

5   fact common to the Class are:

6        (a)   whether defendants violated the Securities Act;

7        (b)   whether the Registration Statement was negligently prepared and contained

8   inaccurate statements of material fact and omitted material information required to be stated therein;

9   and

10       (c)   to what extent the members of the Class have sustained damages and the proper

11  measure of damages.

12  126.   A class action is superior to all other available methods for the fair and efficient

13  adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

14  damages suffered by individual Class members may be relatively small, the expense and burden of

15  individual litigation make it impossible for members of the Class to individually redress the wrongs

16  done to them.  There will be no difficulty in the management of this action as a class action.

17  **FIRST CAUSE OF ACTION**

18  **For Violation of §11 of the Securities Act**
    **Against All Defendants**

19

20  127.   Plaintiff incorporates ¶¶1-126 by reference.

21  128.   This Cause of Action is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k,

22  on behalf of the Class, against all defendants.

23  129.   The Registration Statement contained untrue statements of material facts, omitted to state

24  other facts necessary to make the statements made not misleading, and omitted to state material facts

25  required to be stated therein.

26  130.   Defendants are strictly liable to plaintiff and the Class for the misstatements and

27  omissions.

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

131.     None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

132.     By reason of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, §11 of the Securities Act.

133.     Plaintiff acquired Alibaba ADS shares pursuant to the Registration Statement.

134.     Plaintiff and the Class have sustained damages.  The value of Alibaba ADS shares has declined substantially subsequent to and due to defendants' violations.

135.     At the time of their purchases of Alibaba ADS shares, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.  Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that plaintiff commenced this action.  Less than three years has elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time plaintiff commenced this action.

## SECOND CAUSE OF ACTION

### For Violation of §12(a)(2) of the Securities Act
### Against All Defendants

136.     Plaintiff incorporates ¶¶1-135 by reference.

137.     This Cause of Action is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), against all defendants.

138.     By means of the defective Prospectuses, defendants promoted and sold Alibaba ADS shares to plaintiff and other members of the Class.

139.     The prospectus for the IPO contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above.  Defendants owed plaintiff and the other members of the Class who purchased Alibaba ADS shares pursuant to the prospectus the duty to make a reasonable and diligent investigation of the statements contained in the prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order

- 31 -

1  to make the statements contained therein not misleading. Defendants, in the exercise of reasonable

2  care, should have known of the misstatements and omissions contained in the prospectus as set forth

3  above.

4          140.    Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of

5  the untruths and omissions contained in the prospectus at the time plaintiff acquired Alibaba ADS

6  shares.

7          141.    By reason of the conduct alleged herein, defendants violated §12(a)(2) of the Securities

8  Act. As a direct and proximate result of such violations, plaintiff and the other members of the Class

9  who purchased Alibaba ADS shares pursuant to the prospectus sustained substantial damages in

10  connection with their purchases of the shares. Accordingly, plaintiff and the other members of the

11  Class who hold Alibaba ADS shares issued pursuant to the prospectus have the right to rescind and

12  recover the consideration paid for their shares, and hereby tender their shares to defendants sued herein.

13  Class members who have sold their shares seek damages to the extent permitted by law.

**THIRD CAUSE OF ACTION**

**For Violation of §15 of the Securities Act**
**Against All Defendants**

142.    Plaintiff incorporates ¶¶1-141 by reference.

143.    This Cause of Action is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o,

against all defendants.

144.    The Individual Defendants were controlling persons of Alibaba by virtue of their

positions as directors and/or senior officers of Alibaba. The Individual Defendants each had a series of

direct and/or indirect business and/or personal relationships with other directors and/or officers and/or

major shareholders of Alibaba. The Company controlled the Individual Defendants and all of Alibaba's

employees.

145.    Alibaba and the Individual Defendants were each culpable participants in the violations

of §§11 and 12(a)(2) of the Securities Act alleged in the First and Second Causes of Action above,

based on their having signed or authorized the signing of the Registration Statement and having

otherwise participated in the process which allowed the IPO to be successfully completed.

1
**PRAYER FOR RELIEF**

2       WHEREFORE, plaintiff prays for relief and judgment, as follows:

3       A.      Under California Code of Civil Procedure §382, certifying this class action, appointing

4   plaintiff as a Class representative, and appointing plaintiff's counsel Class Counsel;

5       B.      Awarding damages in favor of plaintiff and the Class against all defendants, jointly and

6   severally, in an amount to be proven at trial, including interest thereon;

7       C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this

8   action, including counsel fees and expert fees;

9       D.      Awarding rescission or a rescissory measure of damages; and

10      E.      Such equitable/injunctive or other relief as deemed appropriate by the Court.

11
**JURY DEMAND**

12      Plaintiff demands trial by jury.

13  DATED: October 5, 2015                    ROBBINS GELLER RUDMAN
                                              & DOWD LLP
14                                            SHAWN A. WILLIAMS
                                              DAVID W. HALL
15

16

17                                            SHAWN A. WILLIAMS

18                                            Post Montgomery Center
                                              One Montgomery Street, Suite 1800
19                                            San Francisco, CA 94104
                                              Telephone: 415/288-4545
20                                            415/288-4534 (fax)

21                                            Attorneys for Plaintiff

22  I:\Admin\CptDraft\Securities\Cpt Alibaba.docx

23

24

25

26

27

28

- 33 -

# NOTICE OF CASE MANAGEMENT CONFERENCE

**ENDORSED FILED**
**SAN MATEO COUNTY**

OCT - 5 2015

~~Clerk of the~~
By __MADELINE MASTERSON__
DEPUTY CLERK

_Gary Buelow_

vs.

_Alibaba Group, et al_

Case No: **CIV 535692**

Date: _2/10/16_

Time 9:00 a.m.

Dept. _____   —on Tuesday & Thursday
Dept. __21__   —on Wednesday & Friday

You are hereby given notice of your Case Management Conference. The date, time and department have been written above.

1.  In accordance with applicable California Rules of the Court and local Rules 2.3(d)1-4 and 2.3(m), you are hereby ordered to:

    a)  **Serve** all named defendants and file proofs of service on those defendants with the court within **60-days** of filing the complaint (CRC 201.7).

    b)  **Serve** a copy of this notice, Case Management Statement and ADR information Sheet on all named parties in this action.

    c)  **File and serve** a completed Case Management Statement at least **15-days** before the Case Management Conference [CRC 212(g)]. Failure to do so may result in monetary sanctions.

    d)  **Meet and confer**, in person or by telephone, to consider each of the issues identified in CRC 212(f) no later than **30-days** before the date set for the Case Management Conference.

2.  If you fail to follow the orders above, you are ordered to show cause why you should not be sanctioned. The Order to Show Cause hearing will be at the same time as the Case Management Conference hearing. Sanctions may include monetary, evidentiary or issue sanctions as well as striking pleadings and/or dismissal.

3.  Continuances of Case Management Conferences are highly disfavored unless good cause is shown.

4.  Parties may proceed to an appropriate dispute resolution process ("ADR") by filing a Stipulation to ADR and Proposed Order (see attached form). If plaintiff files a Stipulation to ADR and Proposed Order electing to proceed to judicial arbitration, the Case Management Conference will be taken off the court calendar and the case will be referred to the Arbitration Administrator. If plaintiffs and defendants file a completed stipulation to another ADR process (e.g., mediation) 10–days prior to the first scheduled Case Management Conference, the Case Management Conference will be continued for 90-days to allow parties time to complete their ADR session. The court will notify parties of their new Case Management Conference date.

5.  If you have filed a default or a judgment has been entered, your case is not automatically taken off Case Management Conference Calendar. If "Does", "Roes," etc. are named in your complaint, they must be dismissed in order to close the case. If any party is in bankruptcy, the case is stayed only as to that named party.

6.  You are further ordered to appear in person* (or through your attorney of record) at the Case Management Conference noticed above. You must be thoroughly familiar with the case and fully authorized to proceed.

7.  The Case Management judge will issue orders at the conclusion of the conference that may include:

    a)  Referring parties to voluntary ADR and setting an ADR completion date;

    b)  Dismissing or severing claims or parties;

    c)  Setting a trial date.

8.  The Case Management judge may be the trial judge in this case.

For further information regarding case management policies and procedures, see the court's website at: __www.sanmateocourt.org__

*Telephonic appearances at case management conferences are available by contacting CourtCall, LLC, an independent vendor, at least five business days prior to the scheduled conference (see attached CourtCall information).

**APPROPRIATE DISPUTE RESOLUTION INFORMATION SHEET**

**SUPERIOR COURT OF CALIFORNIA, SAN MATEO COUNTY**

In addition to the court provided voluntary and mandatory settlement conferences, this court has established, in partnership with the community and Bar Association, the Multi-Option ADR Project. Recognizing that many civil disputes can be resolved without the time and expense of traditional civil litigation, the San Mateo County Superior Court encourages the parties in civil cases to explore and pursue the use of Appropriate Dispute Resolution

**WHAT IS APPROPRIATE DISPUTE RESOLUTION?**

Appropriate Dispute Resolution (ADR) is the general term applied to a wide variety of dispute resolution processes which are alternatives to lawsuits.   Types of ADR processes include arbitration, mediation, neutral evaluation, mini-trials, settlement conferences, private judging, negotiation, and hybrids of these processes.   All ADR processes offer a partial or complete alternative to traditional court litigation for resolving disputes.

**WHAT ARE THE ADVANTAGES OF USING ADR?**

ADR can have a number of advantages over traditional court litigation.

- **ADR can save time**.  Even in a complex case, a dispute can be resolved through ADR in a matter of months or weeks, while a lawsuit can take years.

- **ADR can save money.**  By producing earlier settlements, ADR can save parties and courts money that might otherwise be spent on litigation costs (attorney's fees and court expenses).

- **ADR provides more participation.**  Parties have more opportunity with ADR to express their own interests and concerns, while litigation focuses exclusively on the parties' legal rights and responsibilities.

- **ADR provides more control and flexibility.**  Parties can choose the ADR process most appropriate for their particular situation and that will best serve their particular needs.

- **ADR can reduce stress and provide greater satisfaction.**  ADR encourages cooperation and communication, while discouraging the adversarial atmosphere found in litigation.  Surveys of disputants who have gone through ADR have found that satisfaction with ADR is generally high, especially among those with extensive ADR experience.

**Arbitration, Mediation, and Neutral Evaluation**

Although there are many different types of ADR processes, the forms most commonly used to resolve disputes in California State courts are Arbitration, Mediation and Neutral Evaluation.   The Multi-Option ADR Project a partnership of the Court, Bar and Community offers pre-screened panelists with specialized experience and training in each of these areas.

**Arbitration:** An arbitrator hears evidence presented by the parties, makes legal rulings, determines facts and makes an arbitration award.  Arbitration awards may be entered as

judgments in accordance with the agreement of the parties or, where there is no agreement, in accordance with California statutes.  Arbitrations can be binding or non-binding, as agreed by the parties in writing.

**Mediation:** Mediation is a voluntary, informal, confidential process in which the mediator, a neutral third party, facilitates settlement negotiations.  The mediator improves communication by and among the parties, helps parties clarify facts, identify legal issues, explore options and arrive at a mutually acceptable resolution of the dispute.

**Neutral Evaluation:** Involves presentations to a neutral third party with subject matter expertise who may render an opinion about the case the strengths and weaknesses of the positions, the potential verdict regarding liability, and a possible range for damages.

**CIVIL ADR PROCEDURES FOR THE SAN MATEO COUNTY SUPERIOR COURT**

- Upon filing a Complaint, the Plaintiff will receive this **information sheet** from the Superior Court Clerk.  Plaintiff is expected to include this information sheet when he or she **serves the Complaint** on the Defendant.

- All parties to the dispute may voluntarily agree to take the matter to an ADR process. A stipulation is provided here.  Parties chose and contact their own ADR provider. A Panelist List is available online.

- If the parties have not agreed to use an ADR process, an initial Case Management Conference ("CMC") will be scheduled within 120 days of the filing of the Complaint.  An **original and copy of the Case Management Conference Statement must be completed and provided to the court clerk no later than 15 days prior to the scheduled conference**. The San Mateo County Superior Court Case Management Judges will strongly encourage all parties and their counsel to consider and utilize ADR procedures and/or to meet with the ADR director and staff where appropriate.

- If the parties voluntarily agree to ADR, the parties will be required to sign and file a **Stipulation and Order to ADR.**

- A timely filing of a stipulation (at least 10 days prior to the CMC) will cause a notice to vacate the CMC.  ADR stipulated cases (other than judicial arbitration) will be continued for further ADR/Case Management status review in 90 days.  If the case is resolved through ADR, the status review date may be vacated if the court receives a dismissal or judgment. The court may upon review of case information suggest to parties an ADR referral to discuss matters related to case management, discovery and ADR.

- Any ADR Services shall be paid for by the parties pursuant to a separate ADR fee agreement. The ADR Director may screen appropriate cases for financial aid where a party is indigent.

- Local Court Rules require your cooperation in evaluating the ADR Project and will expect a brief evaluation form to be completed and submitted **within 10 days of completion of the process.**

**You can find ADR forms on the ADR webpage: www.sanmateocourt.org/adr. For more information contact the Multi-Option ADR Project at (650) 261-5075 or 261-5076.**



SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN MATEO
MULTI OPTION ADR PROJECT
HALL OF JUSTICE AND RECORDS
400 COUNTY CENTER
REDWOOD CITY, CALIFORNIA 94063

## ADR Stipulation and Evaluation Instructions

In accordance with *Local Rule 2.3(i)(3)*, all parties going to ADR must complete a Stipulation and Order to ADR and file it with the Clerk of the Superior Court. The Office of the Clerk is located at:

> Clerk of the Superior Court, Civil Division
> Attention: Case Management Conference Clerk
> Superior Court of California, County of San Mateo
> 400 County Center
> Redwood City, CA 94063-1655

There is no filing fee for filing the stipulation. An incomplete stipulation will be returned to the parties by the Clerk's Office. All stipulations must include the following:

> ❑ Original signatures for all attorneys (and/or parties in pro per);
> ❑ The name of the neutral;
> ❑ Date of the ADR session; and
> ❑ Service List (Counsel need not serve the stipulation on parties).

Parties mutually agree on a neutral and schedule ADR sessions directly with the neutral. If parties would like a copy of the court's Civil ADR Program Panelist List and information sheets on individual panelists, they may visit the court's website at www.sanmateocourt.org/adr.

**If Filing the Stipulation Prior to an Initial Case Management Conference**
To stipulate to ADR prior to the initial case management conference, parties must file a completed stipulation at least 10 days before the scheduled case management conference. The clerk will send notice of a new case management conference date approximately 90 days from the current date to allow time for the ADR process to be completed.

**If Filing Stipulation Following a Case Management Conference**
When parties come to an agreement at a case management conference to utilize ADR, they have 21 days from the date of the case management conference to file a Stipulation and Order to ADR with the court [*Local Rule 2.3(i)(3)*].

**Post-ADR Session Evaluations**
*Local Rule 2.3(i)(5)* requires submission of post-ADR session evaluations within 10 days of completion of the ADR process. Evaluations are to be filled out by both attorneys and clients. A copy of the Evaluation By Attorneys and Client Evaluation are attached to the Civil ADR Program Panelist List or can be downloaded from the court's web site.

**Non-Binding Judicial Arbitration**
Names and dates are not needed for stipulations to judicial arbitration. The Judicial Arbitration Administrator will send a list of names to parties once a stipulation has been submitted.

For further information regarding San Mateo Superior Court's Civil ADR and Judicial Arbitration Programs, visit the Court's website at www.sanmateocourt.org/adr or contact the ADR offices at **(650) 261-5075 or (650) 261-5076**.

| Attorney or Party without Attorney (Name, Address, Telephone, Fax, State Bar membership number): | Court Use Only |
|---|---|
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN MATEO<br>Hall of Justice and Records<br>400 County Center<br>Redwood City, CA 94063-1655   (650) 363-4711 | |
| Plaintiff(s): | Case number: |
| Defendant(s): | Current CMC Date: |

## STIPULATION AND ORDER TO APPROPRIATE DISPUTE RESOLUTION

Plaintiff will file this stipulation with the Clerk's Office 10 days prior to or 3 weeks following the first Case Management Conference unless directed otherwise by the Court and ADR Director [*Local Rule 2.3(i)(3)*].  Please attach a Service List.

The parties hereby stipulate that all claims in this action shall be submitted to (select one):
- ◯ Voluntary Mediation
- ◯ Neutral Evaluation
- ◯ **Non-Binding Judicial Arbitration CCP 1141.12**
- ◯ Binding Arbitration (private)
- ◯ Settlement Conference (private)
- ◯ Summary Jury Trial   ◯ Other: _____

Case Type: _____

Neutral's name and telephone number: _____ Date of session: _____
(Required for continuance of CMC except for non-binding judicial arbitration)
Identify by name the parties to attend ADR session: _____

_____

Original Signatures

Type or print name of ☐Party without attorney☐Attorney for
☐Plaintiff/Petitioner☐Defendant/Respondent/Contestant

_____
(Signature)
Attorney or Party without attorney

Type or print name of ☐Party without attorney☐Attorney for
☐Plaintiff/Petitioner☐Defendant/Respondent/Contestant

_____
(Signature)
Attorney or Party without attorney

Type or print name of ☐Party without attorney☐Attorney for
☐Plaintiff/Petitioner☐Defendant/Respondent/Contestant

_____
(Signature)
Attorney or Party without attorney

Type or print name of ☐Party without attorney☐Attorney for
☐Plaintiff/Petitioner☐Defendant/Respondent/Contestant

_____
(Signature)
Attorney or Party without attorney

## IT IS SO ORDERED:

Date: _____

_____
Judge of the Superior Court of San Mateo County

CM-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.: | FAX NO. *(Optional):* | |
| E-MAIL ADDRESS *(Optional):* | |
| ATTORNEY FOR *(Name):* | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF
  STREET ADDRESS:
  MAILING ADDRESS:
  CITY AND ZIP CODE:
  BRANCH NAME:

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| **CASE MANAGEMENT STATEMENT** | CASE NUMBER: |
|---|---|
| *(Check one):* ☐ **UNLIMITED CASE** (Amount demanded exceeds $25,000)    ☐ **LIMITED CASE** (Amount demanded is $25,000 or less) | |

A **CASE MANAGEMENT CONFERENCE** is scheduled as follows:

Date:           Time:          Dept.:        Div.:        Room:

Address of court *(if different from the address above):*

☐   **Notice of Intent to Appear by Telephone,** by *(name):*

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

1. **Party or parties** *(answer one):*
   a. ☐   This statement is submitted by party *(name):*
   b. ☐   This statement is submitted **jointly** by parties *(names):*

2. **Complaint and cross-complaint** *(to be answered by plaintiffs and cross-complainants only)*
   a.   The complaint was filed on *(date):*
   b. ☐   The cross-complaint, if any, was filed on *(date):*

3. **Service** *(to be answered by plaintiffs and cross-complainants only)*
   a. ☐   All parties named in the complaint and cross-complaint have been served, have appeared, or have been dismissed.
   b. ☐   The following parties named in the complaint or cross-complaint
       (1) ☐   have not been served *(specify names and explain why not):*

       (2) ☐   have been served but have not appeared and have not been dismissed *(specify names):*

       (3) ☐   have had a default entered against them *(specify names):*

   c. ☐   The following additional parties may be added *(specify names, nature of involvement in case, and date by which they may be served):*

4. **Description of case**
   a.   Type of case in ☐ complaint    ☐ cross-complaint    *(Describe, including causes of action):*

Form Adopted for Mandatory Use
Judicial Council of California
CM-110 [Rev. July 1, 2011]

**CASE MANAGEMENT STATEMENT**

Cal. Rules of Court,
rules 3.720–3.730
www.courts.ca.gov

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

4.  b.  Provide a brief statement of the case, including any damages. *(If personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date [indicate source and amount], estimated future medical expenses, lost earnings to date, and estimated future lost earnings. If equitable relief is sought, describe the nature of the relief.)*

☐   *(If more space is needed, check this box and attach a page designated as Attachment 4b.)*

5.  **Jury or nonjury trial**
The party or parties request  ☐ a jury trial  ☐ a nonjury trial.  *(If more than one party, provide the name of each party requesting a jury trial):*

6.  **Trial date**
a.  ☐  The trial has been set for *(date):*
b.  ☐  No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint *(if not, explain):*

c.  Dates on which parties or attorneys will not be available for trial *(specify dates and explain reasons for unavailability):*

7.  **Estimated length of trial**
The party or parties estimate that the trial will take *(check one):*
a.  ☐  days *(specify number):*
b.  ☐  hours (short causes) *(specify):*

8.  **Trial representation** *(to be answered for each party)*
The party or parties will be represented at trial  ☐ by the attorney or party listed in the caption  ☐ by the following:
a.  Attorney:
b.  Firm:
c.  Address:
d.  Telephone number:          f.  Fax number:
e.  E-mail address:            g.  Party represented:
☐  Additional representation is described in Attachment 8.

9.  **Preference**
☐  This case is entitled to preference *(specify code section):*

10. **Alternative dispute resolution (ADR)**
a.  **ADR information package.** Please note that different ADR processes are available in different courts and communities; read the ADR information package provided by the court under rule 3.221 for information about the processes available through the court and community programs in this case.
(1)  For parties represented by counsel: Counsel ☐ has ☐ has not  provided the ADR information package identified in rule 3.221 to the client and reviewed ADR options with the client.

(2)  For self-represented parties: Party ☐ has ☐ has not  reviewed the ADR information package identified in rule 3.221.
b.  **Referral to judicial arbitration or civil action mediation** (if available).
(1)  ☐  This matter is subject to mandatory judicial arbitration under Code of Civil Procedure section 1141.11 or to civil action mediation under Code of Civil Procedure section 1775.3 because the amount in controversy does not exceed the statutory limit.

(2)  ☐  Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.

(3)  ☐  This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court or from civil action mediation under Code of Civil Procedure section 1775 et seq. *(specify exemption):*

**CM-110**

| | |
|---|---|
| PLAINTIFF/PETITIONER: <br><br> DEFENDANT/RESPONDENT: | CASE NUMBER: |

10. c. Indicate the ADR process or processes that the party or parties are willing to participate in, have agreed to participate in, or have already participated in *(check all that apply and provide the specified information)*:

| | The party or parties completing this form **are willing** to participate in the following ADR processes *(check all that apply):* | If the party or parties completing this form in the case **have agreed** to participate in or have already completed an ADR process or processes, indicate the status of the processes *(attach a copy of the parties' ADR stipulation):* |
|---|---|---|
| (1) Mediation | ☐ | ☐ Mediation session not yet scheduled <br> ☐ Mediation session scheduled for *(date):* <br> ☐ Agreed to complete mediation by *(date):* <br> ☐ Mediation completed on *(date):* |
| (2) Settlement conference | ☐ | ☐ Settlement conference not yet scheduled <br> ☐ Settlement conference scheduled for *(date):* <br> ☐ Agreed to complete settlement conference by *(date):* <br> ☐ Settlement conference completed on *(date):* |
| (3) Neutral evaluation | ☐ | ☐ Neutral evaluation not yet scheduled <br> ☐ Neutral evaluation scheduled for *(date):* <br> ☐ Agreed to complete neutral evaluation by *(date):* <br> ☐ Neutral evaluation completed on *(date):* |
| (4) Nonbinding judicial arbitration | ☐ | ☐ Judicial arbitration not yet scheduled <br> ☐ Judicial arbitration scheduled for *(date):* <br> ☐ Agreed to complete judicial arbitration by *(date):* <br> ☐ Judicial arbitration completed on *(date):* |
| (5) Binding private arbitration | ☐ | ☐ Private arbitration not yet scheduled <br> ☐ Private arbitration scheduled for *(date):* <br> ☐ Agreed to complete private arbitration by *(date):* <br> ☐ Private arbitration completed on *(date):* |
| (6) Other *(specify):* | ☐ | ☐ ADR session not yet scheduled <br> ☐ ADR session scheduled for *(date):* <br> ☐ Agreed to complete ADR session by *(date):* <br> ☐ ADR completed on *(date):* |

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**11. Insurance**
  a. ☐ Insurance carrier, if any, for party filing this statement *(name)*:
  b. Reservation of rights: ☐ Yes ☐ No
  c. ☐ Coverage issues will significantly affect resolution of this case *(explain)*:


**12. Jurisdiction**
  Indicate any matters that may affect the court's jurisdiction or processing of this case and describe the status.
  ☐ Bankruptcy ☐ Other *(specify)*:
  Status:

**13. Related cases, consolidation, and coordination**
  a. ☐ There are companion, underlying, or related cases.
      (1) Name of case:
      (2) Name of court:
      (3) Case number:
      (4) Status:
      ☐ Additional cases are described in Attachment 13a.
  b. ☐ A motion to ☐ consolidate ☐ coordinate will be filed by *(name party)*:

**14. Bifurcation**
  ☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons)*:


**15. Other motions**
  ☐ The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues)*:


**16. Discovery**
  a. ☐ The party or parties have completed all discovery.
  b. ☐ The following discovery will be completed by the date specified *(describe all anticipated discovery)*:

| Party | Description | Date |
|---|---|---|
| | | |




  c. ☐ The following discovery issues, including issues regarding the discovery of electronically stored information, are anticipated *(specify)*:

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**17. Economic litigation**

a. ☐ This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90-98 will apply to this case.

b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed *(if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case):*

**18. Other issues**

☐ The party or parties request that the following additional matters be considered or determined at the case management conference *(specify):*

**19. Meet and confer**

a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court *(if not, explain):*

b. After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following *(specify):*

**20. Total number of pages attached** *(if any):* _____

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and alternative dispute resolution, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date:

_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY)

_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY)

☐ Additional signatures are attached.

**CASE MANAGEMENT STATEMENT**

# SUPERIOR COURT OF CALIFORNIA COUNTY OF SAN MATEO



# LOCAL COURT RULES

## As Amended
## Effective January 1, 2015

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN MATEO**
Hall of Justice and Records
400 County Center, 2ⁿᵈ Floor
Redwood City, California 94063

Superior Court of California, County of San Mateo

**RULE NUMBERS 2.23 TO 2.29 ARE RESERVED**

## CHAPTER 7. COMPLEX CASES

Rule 2.30   Determination of Complex Case Designation.

**A.     Decision of Complex Case to be Made by Presiding Judge**

The Presiding Judge shall decide whether an action is a complex case within the meaning of California Rules of Court, Rule 3.400,  subdivision (a), and whether it should be assigned to a single judge for all purposes.   All status conferences or other hearings regarding whether an action should be designated as complex and receive a singly assigned judge shall be set in the Presiding Judge's department.

**B.   Provisional Designation.**

An action is provisionally a complex case if it involves one or more of the following types of claims: (1) antitrust or trade regulation claims; (2) construction defect claims involving many parties or structures; (3) securities claims or investment losses involving many parties; (4) environmental or toxic tort claims involving many parties; (5) claims involving massive torts; (6) claims involving class actions; or (7) insurance coverage claims arising out of any of the claims listed in subdivisions (1) through (6).

The Court shall treat a provisionally complex action as a complex case until the Presiding Judge has the opportunity to decide whether the action meets the definition in California Rules of Court, Rule 3.400, subdivision (a).

**C.   Application to Designate or Counter-Designate an Action as a Complex Case.**

Any party who files either a Civil Case Cover Sheet (pursuant to California Rules of Court, Rule 3.401) or a counter or joinder Civil Case Cover Sheet (pursuant to California Rules of Court, Rule 3.402, subdivision (b) or (c)), designating an action as a complex case in Items 1, 2 and/or 5, must also file an accompanying Certificate Re: Complex Case Designation in the form prescribed by the Court.   The certificate must include supporting information showing a reasonable basis for the complex case designation being sought.   Such supporting information may include, without limitation, a brief description of the following factors as they pertain to the particular action:

(1)     Management of a large number of separately represented parties;
(2)     Complexity of anticipated factual and/or legal issues;
(3)     Numerous pretrial motions that will be time-consuming to resolve;
(4)     Management of a large number of witnesses or a substantial amount of documentary evidence;
(5)     Coordination with related actions pending in one or more courts in other counties, states or countries or in a federal court;
(6)     Whether or not certification of a putative class action will in fact be pursued; and
(7)     Substantial post-judgment judicial supervision.

A copy of the Certificate Re: Complex Case Designation must be served on all opposing parties. Any certificate filed by a plaintiff shall be served along with the initial service of copies of the Civil Case Cover Sheet (pursuant to California Rules of Court, Rule 3.401), summons, and complaint in the action. Any certificate filed by a defendant shall be served together with the service of copies of the counter or

Superior Court of California, County of San Mateo

joinder Civil Case Cover Sheet (pursuant to California Rules of Court, Rule 3.402, subdivision (b) or (c)) and the initial first appearance pleading(s).

**D.   Noncomplex Counter-Designation.**

If a Civil Case Cover Sheet designating an action as a complex case and the accompanying Certificate Re: Complex Case Designation has been filed and served and the Court has not previously declared the action to be a complex case, a defendant may file and serve no later than its first appearance a counter Civil Case Cover Sheet designating the action as not a complex case. Any defendant who files such a noncomplex counter-designation must also file and serve an accompanying Certificate Re: Complex Case Designation in the form prescribed by this Court and setting forth supporting information showing a reasonable basis for the noncomplex counter-designation being sought.

Once the Court has declared the action to be a complex case, any party seeking the Presiding Judge's decision that the action is not a complex case must file a noticed motion pursuant to Section H below.

**E.   Decision by Presiding Judge on Complex Case Designation; Early Status Conference.**

If a Civil Case Cover Sheet designating an action as a complex case and the accompanying Certificate Re: Complex Case Designation have been filed and served, the Presiding Judge shall decide as soon as reasonably practicable, with or without a hearing, whether the action is a complex case and should be assigned to a single judge for all purposes.

Upon the filing of a Civil Case Cover Sheet designating an action as a complex case and the accompanying Certificate Re: Complex Case Designation, the Clerk of the Court shall set a status conference at which the Presiding Judge shall decide whether or not the action is a complex case. This status conference shall be held no later than (a) 60 days after the filing of a Civil Case Cover Sheet by a plaintiff (pursuant to California Rules of Court, Rule 3.401) or (b) 30 days after the filing of a counter Civil Case Cover Sheet by a defendant (pursuant to California Rules of Court, Rule 3.402, subdivision (a) or (b)), whichever date is earlier.

Alternatively, in his or her sole discretion, the Presiding Judge may make the decision on complex case designation and single assignment, without a status conference, based upon the filed Civil Case Cover Sheet and accompanying Certificate Re: Complex Case Designation alone.

**F.   Notice.**

The party who seeks a complex case designation or a noncomplex counter-designation must give reasonable notice of the status conference to the opposing party or parties in the action even if they have not yet made a first appearance in the action. Such notice of the status conference shall be given in the same manner as is required for ex parte applications pursuant to California Rule of Court, Rule 379.

**G.   Representations to the Court.**

By presenting to the Court a Certificate Re: Complex Case Designation, an attorney or unrepresented party is certifying to the best of that person's knowledge, information, and belief, formed after reasonable inquiry under the circumstances:

(1)   That the complex case designation or noncomplex counter-designation is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

Superior Court of California, County of San Mateo

(2)    That the claims, defenses, or other legal contentions referenced therein are warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3)    That the statement of supporting information relevant to the complex case designation or noncomplex counter-designation have evidentiary support or are believed, in good faith, likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4)    That there is a reasonable basis for that party's complex case designation or noncomplex counter-designation.

If, after notice and a reasonable opportunity to be heard, the Court determines that this subpart has been violated, the Court may impose an appropriate sanction upon the attorneys, law firms, or self-represented parties that have violated this subpart.

H.    **The Presiding Judge's Continuing Power.**
With or without a hearing, the Presiding Judge may decide, on his or her own motion or on a noticed motion by any party, that a civil action is a complex case or that an action previously declared to be a complex case is not a complex case.

I.    **Pilot Program; Sunset Provision. (Repealed, effective 1/1/2007).**

(Adopted, effective July 1, 2004)(Amended, effective July 1, 2005) (Amended, effective January 1, 2006)(Amended, effective January 1, 2007)

**RULE NUMBERS 2.31 TO 2.35 ARE RESERVED**

**CHAPTER 8.    ACCESS TO COURT RECORDS**

Rule 2.36    Public Access and Privacy

Please reference. California Rules of Court, Rule 1.20.

(Adopted, effective January 1, 2008)

Rule 2.37    Public Access.

Exhibits or attachments to a document that are filed or lodged with or otherwise presented to the court, that are not otherwise marked as confidential or sealed, may be subject to public viewing and access either at the courthouse or electronically on-line (California Rules of Court, Rule 2.503, et seq.).

(Adopted, effective January 1, 2008)

Rule 2.38    Electronic Access.

Documents that are part of a court record are reasonably made available to the public electronically under the Court's Electronic Imaging program as permitted by California Rules of Court, Rules 2.500, et seq. Documents that are not properly protected by being marked confidential or sealed by court order may be subject to public access as discussed in Rule 2.38.

(Adopted, effective January 1, 2008)

Superior Court of California, County of San Mateo

# Important Notice re: Nonrefundable Advance Jury Fees-Please Read

# DEPOSIT OF ADVANCE JURY FEES

# FREQUENTLY ASKED QUESTIONS

(Assembly Bill 1481 (2011-2012 Reg. Sess.))

| | |
|---|---|
| Q. What is the nonrefundable jury fee? | A: At least one party demanding a jury on each side of a civil case must pay a non-refundable fee of one hundred fifty dollars ($150), unless the fee has been paid by another party on the same side of the case. (Code Civ. Proc., § 631(b).) If there are multiple plaintiffs and/or defendants in the same case, only one jury fee per side is *required* to avoid waiver of a jury under Code of Civil Procedure section 631(f). |
| Q: What are the deadlines for paying the nonrefundable jury fee? | A: The nonrefundable jury fee must be paid on or before the date scheduled for the initial case management conference in the action, except as follows:<br><br>1. In unlawful detainer actions the fees shall be due at least five days before the date set for trial.<br><br>2. If no case management conference is scheduled in a civil action, or the initial case management conference occurred before June 28, 2012 and the initial complaint was filed *after* July 1, 2011, the fee shall be due no later than 365 calendar days after the filing of the initial complaint.<br><br>3. If the initial case management conference was held before June 28, 2012 and the initial complaint in the case was filed *before* July 1, 2011, the fee shall be due at least 25 calendar days before the date initially set for trial.<br><br>4. If the party requesting a jury has not appeared before the initial case management conference, or first appeared more than 365 calendar days after the filing of the initial complaint, the fee shall be due at least 25 calendar days before the date initially set for trial. (Code Civ. Proc., § 631(c).) |
| Q: What if a party misses the deadline to pay the nonrefundable jury fee? | A: Except under the circumstances provided in Code of Civil Procedure section 631(d), (discussed in FAQ 1.4), a party has waived the right to a trial by jury in that action, unless another party on the same side of the case timely paid the nonrefundable jury fee. (Code Civ. Proc., § 631(f)(5).)<br>Note: The court may, in its discretion upon just terms, allow a trial by jury despite the waiver. (Code Civ. Proc., § 631(g).) |
| Q: What if a party missed a deadline to pay the nonrefundable jury fee between June 27, 2012 and November 30, 2012? | A: If a party failed to timely pay a nonrefundable jury fee that was due between June 27, 2012, and November 30, 2012, inclusive, the party will be relieved of a jury waiver on that basis only, if the party pays the fee on or before December 31, 2012 or 25 calendar days before the date initially set for trial, whichever is earlier. (Code Civ. Proc., § 631(d).) |

| Q: May a clerk accept payment of a nonrefundable jury fee after the deadline has passed? | A: There is nothing in the recent amendments to Code of Civil Procedure section 631 that directs or authorizes courts to refuse a late payment of the nonrefundable jury fee. Absent this direction or authority, the clerk likely should accept advance jury fees tendered by a party, provide a receipt, and record in the court file the date the fees were received. (See *People v. Funches* (1998) 67 Cal.App.4th 240, 244 [court clerks "must act in strict conformity with statutes, rules, or orders of the court" defining their duties, and have "no power to decide questions of law nor any discretion in performing" their duties.]) Note: Except as provided in Code of Civil Procedure section 631(d), only a judge has the authority to grant a jury trial following a waiver. |
|---|---|
| Q: Is payment of the nonrefundable jury fee required if the party does not want to retain the right to a jury in the action? | A: No. Only parties that want to retain the right to a jury must pay the nonrefundable jury fees. |
| Q: May the nonrefundable jury fee be waived because of a party's financial condition? | A: Yes. A court may (but is not required to) waive jury fees and expenses, and other fees or expenses itemized in an application for a fee waiver under rule 3.56(1) and (6) of the California Rules of Court. |
| Q: May the court waive the nonrefundable jury fee for government entities under Government Code section 6103? | A: No. Government Code section 6103 explicitly states: "This section does not apply to civil jury fees or civil jury deposits." Although this exception to the fee waiver for government entities predates the creation of the nonrefundable jury fee, the plain language of the exception applies to the nonrefundable jury fee. |
| Q: If more than one party on a side pays the nonrefundable jury fee, is any refund of the additional fee due? | A: No. Code of Civil Procedure 631(b) requires "*at least* one party demanding a jury on each side" to pay the nonrefundable jury fee, "unless the fee has been paid by another party on the same side of the case." (Emphasis added.) In addition, Code of Civil Procedure section 631.3, which governs refunds of jury fees states in subdivision (c) that the "fee described in subdivision (b) of Section 631 shall be nonrefundable and is not subject to this section. Therefore, although they are not required to pay the jury fee, if additional parties on a side pay the nonrefundable jury fee, that fee is still nonrefundable. The additional fee may not be used to offset actual juror fees or mileage, either. |
| Q: Are any jury fees refundable? | A: Yes. Any $150 advance jury fee deposited *before* June 28, 2012 may be refunded upon request of a party as provided under Code of Civil Procedure section 631.3. Similarly, any jury fees other than the $150 advance jury fees that are deposited, but not used, may be refunded upon request of a party as provided under Code of Civil Procedure section 631.3. |

1  ROBBINS GELLER RUDMAN
   & DOWD LLP
2  SHAWN A. WILLIAMS (213113)
   CHRISTOPHER P. SEEFER (201197)
3  DAVID W. HALL (274921)
   JOHN H. GEORGE (292332)
4  Post Montgomery Center
   One Montgomery Street, Suite 1800
5  San Francisco, CA 94104
   Telephone: 415/288-4545
6  415/288-4534 (fax)

*RECEIVED SAN MATEO COUNTY*
*OCT 28 2015*
*Clerk of the Superior Court*
*By _____ DEPUTY CLERK*

7  Attorneys for Plaintiff

8        SUPERIOR COURT OF THE STATE OF CALIFORNIA

9             COUNTY OF SAN MATEO

| | |
|---|---|
| 10  GARY BUELOW, Individually and on Behalf of All Others Similarly Situated, )<br>11             Plaintiff,<br>12     vs.<br>13  ALIBABA GROUP HOLDING LIMITED, et al., )<br>14            Defendants.<br>15 | Case No. CIV535692<br><br>CLASS ACTION<br><br>STIPULATION AND [PROPOSED] ORDER RELATING AND CONSOLIDATING CASES AND APPOINTING LEAD COUNSEL<br><br>DATE ACTION FILED: 10/05/15 |
| 16  RUSTEM NURLYBAYEV, Individually and on Behalf of All Others Similarly Situated,<br>17             Plaintiff,<br>18<br>19     vs.<br>20  ALIBABA GROUP HOLDING LIMITED, et al., )<br>21            Defendants. | Case No. CIV535840<br><br>CLASS ACTION<br><br><br>DATE ACTION FILED: 10/15/15 |
| 22  MICHAEL HERCULES, Individually and on Behalf of All Others Similarly Situated,<br>23             Plaintiff,<br>24     vs.<br>25  ALIBABA GROUP HOLDING LIMITED, et al., )<br>26            Defendants. | Case No. CIV535887<br><br>CLASS ACTION<br><br><br>DATE ACTION FILED: 10/16/15 |

27

28

FILE BY FAX

       STIPULATION AND [PROPOSED] ORDER RELATING AND
       CONSOLIDATING CASES AND APPOINTING LEAD COUNSEL

1086657_1

1    WHEREAS, on October 5, 2015, plaintiff Gary Buelow commenced the above-captioned action,

2    Case No. CIV535692 (the "*Buelow* Action"), in the Superior Court of California, County of San Mateo

3    ("San Mateo Superior Court"), filing a Complaint for Violations of the Securities Act of 1933 and a

4    Certificate Re Complex Case Designation;

5    WHEREAS, on October 15, 2015, plaintiff Rustem Nurlybayev filed a complaint in San Mateo

6    Superior Court, Case No. CIV535840 (the "*Nurlybayev* Action"), asserting identical claims against

7    identical defendants;

8    WHEREAS, on October 16, 2015, plaintiff Michael Hercules filed a complaint in San Mateo

9    Superior Court, Case No. CIV535887 (the "*Hercules* Action"), asserting identical claims against

10   identical defendants;

11   WHEREAS, the above-referenced parties agree the *Buelow*, *Nurlybayev*, and *Hercules* Actions

12   are related as defined by California Rule of Court 3.300;

13   WHEREAS, the parties agree that the *Buelow*, *Nurlybayev*, and *Hercules* Actions should be

14   consolidated in accordance with California Rule of Court 3.350; and

15   WHEREAS, plaintiffs in the *Buelow*, *Nurlybayev*, and *Hercules* Actions agree to the

16   appointment of Robbins Geller Rudman & Dowd LLP ("Robbins Geller") and Cotchett, Pitre &

17   McCarthy, LLP ("Cotchett, LLP") as co-lead counsel for plaintiffs and the putative class, and Bottini &

18   Bottini, Inc. ("Bottini, Inc.") as additional counsel for plaintiffs.

19   NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED among the parties,

20   through their respective counsel, to the entry of an Order providing that:

21       1.    The *Buelow*, *Nurlybayev*, and *Hercules* Actions are related and consolidated (the

22   "Consolidated Action"); and

23       2.    Robbins Geller and Cotchett, LLP are appointed lead counsel for plaintiffs, and Bottini,

24   Inc. is appointed additional counsel for plaintiffs.

25

26

27

28

- 1 -

1086657_1

1    IT IS SO STIPULATED.

2    DATED:  October 28, 2015          ROBBINS GELLER RUDMAN
                                          & DOWD LLP
3                                      SHAWN A. WILLIAMS
                                       CHRISTOPHER P. SEEFER
4                                      DAVID W. HALL
                                       JOHN H. GEORGE
5

6

7                                                 SHAWN A. WILLIAMS

8                                      Post Montgomery Center
                                       One Montgomery Street, Suite 1800
9                                      San Francisco, CA  94104
                                       Telephone:  415/288-4545
10                                     415/288-4534 (fax)

11                                     Attorneys for Plaintiff Gary Buelow

12   DATED:  October 28, 2015          BOTTINI & BOTTINI, INC.
                                       FRANCIS A. BOTTINI, JR.
13                                     ALBERT Y. CHANG

14

15                                                 FRANCIS A. BOTTINI, JR.

16

17                                     7817 Ivanhoe Avenue, Suite 102
                                       La Jolla, CA  92037
18                                     Telephone:  858/914-2001
                                       858/914-2002 (fax)

19                                     Attorneys for Plaintiffs Rustem Nurlybayev and
                                       Michael Hercules
20

21   DATED:  October 28, 2015          COTCHETT, PITRE & McCARTHY, LLP
                                       JOSEPH W. COTCHETT
22                                     MARK C. MOLUMPHY

23

24                                                 MARK C. MOLUMPHY

25

26

27

28
                                          - 2 -
                    STIPULATION AND [PROPOSED] ORDER RELATING AND
                    CONSOLIDATING CASES AND APPOINTING LEAD COUNSEL
     1086657_1

1

2      840 Malcolm Road, Suite 200
       Burlingame, CA  94010
3      Telephone:  650/697-6000
       650/697-0577 (fax)

4      Attorneys for Plaintiff Michael Hercules

5

6              *        *        *

7                  **O R D E R**

8      PURSUANT TO STIPULATION, IT IS SO ORDERED.

9    DATED: _____    _____

10                                    THE HONORABLE ROBERT D. FOILES
                                      JUDGE OF THE SUPERIOR COURT
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                             - 3 -

1            <u>DECLARATION OF SERVICE BY MAIL</u>

2      I, the undersigned, declare:

3      1.    That declarant is and was, at all times herein mentioned, a citizen of the United States

4  and employed in the City and County of San Francisco, over the age of 18 years, and not a party to or

5  interested party in the within action; that declarant's business address is Post Montgomery Center, One

6  Montgomery Street, Suite 1800, San Francisco, California 94104.

7      2.    That on October 28, 2015, declarant served the **STIPULATION AND [PROPOSED]**

8  **ORDER RELATING AND CONSOLIDATING CASES AND APPOINTING LEAD COUNSEL**

9  by depositing a true copy thereof in a United States mailbox at San Francisco, California in a sealed

10  envelope with postage thereon fully prepaid and addressed to the following parties listed:

11      **Defendant(s):**
    ALIBABA GROUP HOLDING LIMITED

12      400 So. El Camino Real, #400
    San Mateo, CA 94402

13

14      **Underwriter Defendant(s):**
    CREDIT SUISSE SECURITIES (USA) LLC

15      Registered Agent:
    Corporation Service Company

16      80 State Street
    Albany, NY 12207

17

18      DEUTSCHE BANK SECURITIES
    Registered Agent:

19      CT Corporation System
    111 Eighth Avenue

20      New York, NY 10011

21

22      GOLDMAN SACHS (ASIA) LLC
    Registered Agent:

23      The Corporation Trust Company
    Corporation Trust Center

24      1209 Orange Street
    Wilmington, DE 19801

25

26

27

28

          STIPULATION AND [PROPOSED] ORDER RELATING AND
          CONSOLIDATING CASES AND APPOINTING LEAD COUNSEL

1086657_1

1    J.P. MORGAN SECURITIES LLC
Registered Agent:
2    The Corporation Trust Company
Corporation Trust Center
3    1209 Orange Street
4    Wilmington, DE 19801

5    CITIGROUP GLOBAL MARKETS INC.
Registered Agent:
6    The Corporation Trust Company
Corporation Trust Center
7    1209 Orange Street
8    Wilmington, DE 19801

9    HSBC SECURITIES (USA) INC.
Registered Agent;
10    CT Corporation System
111 Eighth Avenue
11    New York, NY 10011

12

13    MIZUHO SECURITIES USA INC.
Registered Agent:
The Corporation Trust Company
14    Corporation Trust Center
1209 Orange Street
15    Wilmington, DE 19801

16

17    PACIFIC CREST SECURITIES LLC
Registered Agent:
Corporation Service Company
18    80 State Street
19    Albany, NY 12207

20    STIFEL, NICOLAUS & COMPANY INCORPORATED
Registered Agent:
21    CT Corporation System
111 Eighth Avenue
22    New York, NY 10011

23

24    **Counsel for Plaintiff(s):**
COTCHETT, PITRE & McCARTHY, LLP
JOSEPH W. COTCHETT
25    MARK C. MOLUMPHY
840 Malcolm Road, Suite 200
26    Burlingame, CA  94010
Telephone:  650/697-6000
27    650/697-0577 (fax)

28

1  BOTTINI & BOTTINI, INC.
   FRANCIS A. BOTTINI, JR.
2  ALBERT Y. CHANG
   7817 Ivanhoe Avenue, Suite 102
3  La Jolla, CA  92037
   Telephone:  858/914-2001
4  858/914-2002 (fax)

5
   ROBBINS GELLER RUDMAN
6  & DOWD LLP
   SHAWN A. WILLIAMS
7  CHRISTOPHER P. SEEFER
   DAVID W. HALL
8  JOHN H. GEORGE
   Post Montgomery Center
9  One Montgomery Street, Suite 1800
   San Francisco, CA  94104
10 Telephone:  415/288-4545
   415/288-4534 (fax)
11

12     3.     That there is a regular communication by mail between the place of mailing and the

13 places so addressed.

14     I declare under penalty of perjury that the foregoing is true and correct.  Executed on October

15 28, 2015, at San Francisco, California.

16

17                                                    _____
                                                           IVANIA NAVARRETE
18

19

20

21

22

23

24

25

26

27

28

STIPULATION AND [PROPOSED] ORDER RELATING AND
CONSOLIDATING CASES AND APPOINTING LEAD COUNSEL

1086657_1